280 So.2d 874 (1973)
OCEANONICS, INC. and the Rucker Company, Plaintiffs-Appellees,
v.
PETROLEUM DISTRIBUTING COMPANY and Tesoro Petroleum Corporation, Defendants-Appellants,
ALL-STAR INSURANCE CORPORATION and Market Insurance Company, Third-Party Defendants-Appellees,
TAYLOR'S WELDING SERVICE, INC., Third-Party Defendant-Appellant.
No. 4158.
Court of Appeal of Louisiana, Third Circuit.
June 5, 1973.
Rehearings Denied August 15, 1973.
*875 Jones & Jones by J. B. Jones, Jr., Cameron, for defendant-appellant, Taylor's Welding Service, Inc. and H. Ward Fontenot.
Brame, Stewart & Bergstedt by Joseph A. Brame, Lake Charles, for defendant-appellee, Market Ins. Co.
Plauché, Smith & Hebert by A. Lane Plauché, Lake Charles, for defendant-appellee, All-Star Ins. Corp.
Liskow & Lewis by Kenneth E. Gordon, Jr., Lafayette, for defendants-appellees-appellants.
Before FRUGÉ, HOOD and CULPEPPER, JJ.
HOOD, Judge.
This is an action for damages instituted by Oceanonics, Inc., and The Rucker Company against Petroleum Distributing Company, Inc., ("Pedco") and Tesoro Petroleum Corporation ("Tesoro"). Both of these defendants answered and filed third party demands against Taylor's Welding Service, Inc., and its alleged insurers, Market Insurance Company ("Market") and All-Star Insurance Corporation ("All-Star").
Market and All-Star filed motions for summary judgment seeking to have the third party actions against them dismissed. After a hearing, a summary judgment was rendered by the trial court on November 17, 1972, dismissing the third party action against All-Star, and a separate summary judgment was rendered on November 30, 1972, dismissing the third party action against Market. Pedco, Tesoro and Taylor's Welding Service have appealed.
The principal question presented is whether the loss sustained by plaintiffs was covered in the policy which was issued by Market to Taylor's Welding Service, effective September 12, 1969, or whether it was covered in the policy which was issued by All-Star to Taylor's, effective September 12, 1970. The trial judge concluded that coverage was not provided by either of those policies. We affirm.
Taylor's Welding Service was engaged in the business of performing general welding work in Cameron Parish during the year 1970. On August 13, 1970, an employee of Taylor's performed a weld on the boom of a crane owned by Pedco. Almost *876 three months later, on November 8, 1970, the boom collapsed while it was being used by Pedco and Tesoro to lift a heavy machine known as a "mole," owned by plaintiff Oceanonics, and as a result of that collapse the mole was damaged or destroyed. The welding operations conducted by Taylor's had been completed before the crane collapsed, and the damage occurred away from the premises owned by Taylor's.
Plaintiffs sued Pedco and Tesoro for the damages they sustained, alleging as the principal ground for that claim that the defendants were negligent in failing to maintain the crane in such a state of repair as to be able to lift the crane's represented capacity. Pedco and Tesoro then filed third party demands against Taylor's Welding Service and its alleged insurers, Market and All-Star, alleging that an employee of Taylor's was negligent in performing a defective weld on the boom of the crane, and that his negligence in that respect was the proximate cause of the loss.
Market had issued a comprehensive general liability insurance policy to Taylor's Welding Service, for a term beginning September 12, 1969, and ending September 12, 1970. The policy specifically provided coverage for "completed operations and products liability."
All-Star issued a comprehensive general liability policy to Taylor's Welding Service, for a term beginning September 12, 1970, and ending September 12, 1971. This policy did not provide completed operations and products liability coverage.
The allegedly defective welding thus was performed by Taylor's Welding Service on August 13, 1970, while the Market policy was in effect. The boom collapsed and plaintiffs' machine was damaged on November 8, 1970, after the term of the Market policy had expired and while the All-Star policy was in effect. There is a dispute as to whether the loss was covered by the Market policy, or by the All-Star policy, or by either of said policies.
We will consider the Market policy first. We have already noted that it provided completed operations coverage. The protection provided in that type coverage is explained in the policy as follows:
"`Completed operations hazard' includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured."
The property damage for which plaintiffs seek to be compensated arose out of "operations" conducted by the insured, and in reliance upon a representation made by the insured with respect thereto. The property damage occurred after such operations had been completed, and it occurred away from the premises owned by or rented to the named insured. The loss sustained by plaintiffs thus is precisely the type loss which is described in the above quoted part of the policy.
In connection with the completed operations coverage, the policy also provides that:
"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence."

The word "Occurrence" is defined in the policy as meaning "... an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
The policy also stipulates that, "This insurance applies only to bodily injury or property damage which occurs during the policy period within the policy territory."
*877 The Market policy thus obligates the insurer to pay on behalf of the insured all sums which the latter shall become legally obligated to pay as property damages caused by an "occurrence." An "occurrence" is defined as an accident which results in property damage "during the policy period." And, the policy then adds that this insurance applies only to property damage "which occurs during the policy period." We interpret the policy as providing completed operations coverage only if the bodily injury or property damage occurs during the policy period.
The property damage which forms the basis for the instant suit occurred almost two months after the term of the Market policy had expired. The Market policy thus provided no coverage for that loss.
Appellants argue, however, that the "occurrence" took place or the loss occurred when the tortious act was committed, that is, when the weld was made on August 13, 1970, and not when the damage was sustained or when it became manifest (on November 8, 1970). They contend that Market is liable because the tortious act was committed during the term of the Market policy. Three cases are cited to support that argument. Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958); Taylor Contracting & Supply Company v. American Mutual Liability Ins. Co., 163 So.2d 450 (La.App. 2 Cir. 1964), and Audubon Coin & Stamp Co. v. Alford Safe & Lock Co., 230 So.2d 278 (La.App. 1 Cir. 1969).
The insurance policy involved in each of the cited cases required the insurer to pay on behalf of the insured all sums which the latter become obligated to pay as damages because of destruction of property caused by "accident." Each such policy either provided that it applied only to "accidents" which occurred during the policy period, or it specifically excluded coverage of "accidents" which occurred after completion of the work. There was no provision in any such policy to the effect that the coverage applied only to property damage which occurred durning the policy period.
The courts, in interpreting those policy provisions, held that the term "accident," as used in each policy, referred to the tortious act which eventually caused the property damage, and that the "accident" thus was deemed to have occurred at the time the tort was committed, and not when the damage was sustained or when it became manifest.
In Taylor Contracting & Supply Company v. American Mutual Liability Ins. Co., supra, for instance, the court stated the rule as follows:
"It is clear to this court that the King [King v. Mason, 234 La. 299, 99 So.2d 117] and Kendrick cases determine that the loss was caused by accident at the time the tort was committed and not the time when the damage was sustained or became manifest."
And, in Audubon Coin & Stamp Co. v. Alford Safe & Lock Co., supra, the court said:
"The rule is now established that loss occurs upon the happening of the event giving rise thereto, that is at the time the tort is committed, and not when the loss is discovered or becomes manifest."
The cited cases are applicable to policies which contain stipulations similar or identical to the provisions in the policies which were involved there.
The policy which was issued by Market and is before us in the instant suit, however, contains provisions which are significantly different from the policy provisions considered in the Kendrick, Taylor and Audubon cases. The Market policy, for instance, binds the insurer to pay sums which the insured may become obligated to pay as damages caused by an "occurrence," instead of an "accident." And, an "occurrence" is described in the policy as an accident which results in property damage during the policy period. The Market policy also contains another provision which states specifically that it applies only to property damage which occurs during the *878 policy period. There were no provisions in the policies involved in Kendrick, Taylor and Audubon to the effect that coverage applied only to property damage which occurred during the policy period.
It appears to us that the language used in the Market policy was designed for the express purpose of avoiding the results of the Kendrick, Taylor and Audubon cases. The policy stipulates in clear, unambiguous language that coverage is provided only for property damage which occurs during the policy period. That policy provision cannot be reconciled with the rule which was applied in the cited cases.
In the absence of a conflict with statutes or with public policy, insurers have the same rights as do individuals to limit their liability and to enforce whatever conditions they please upon their obligations. In such an event unambiguous provisions in the insurance contract limiting liability must be given effect. Niles v. American Bankers Insurance Co., 258 So.2d 705 (La.App. 3 Cir. 1972).
We find that in this instance Market had the right to limit its liability to property damage which occurred during the policy period. Since the provisions in the Market policy are different from those contained in the policies involved in Kendrick, Taylor and Audubon, we hold that those cases are not applicable here. Our conclusion is that no coverage was provided in the Market policy since the property damage did not occur during the policy period.
Appellants contend, alternatively, that Market is liable under the "collapse hazard" coverage provided in the insurance contract which it issued to Taylor's. That type of coverage is defined in the policy as follows:
"`collapse hazard' includes `structural property damage' as defined herein and property damage to any other property at any time resulting therefrom. `Structural property damage' means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard or the underground property damage hazard, or (3) for which liability is assumed by the insured under an incidental contract;"
It is argued that the term "structural property damage," as used in the policy, includes the collapse of the boom due to the "rebuilding of any structural support thereof." Appellants contend that Taylor's welded a structural support of the boom, and they argue that if damage occurs to other property "at any time" as a result thereof, coverage is included in the "collapse hazard" provision of the policy.
We have concluded that the collapse hazard feature of the policy does not include coverage of the loss sustained by plaintiffs in this case. The above quoted portion of the policy includes a stipulation that "The collapse hazard does not include property damage ... included within the completed operations hazard ..." We have found that the loss sustained by plaintiffs here is precisely the type of loss which is included in the policy definition of "Completed Operations Hazard." Market, in fact, would have been liable under the Completed Operations Coverage of the policy had the property damage occurred during the policy period.
We interpret the above mentioned exclusionary clause to mean that a loss which falls within the definition of a "completed operations hazard" is excluded from coverage under the "collapse hazard" provision of the policy. We thus hold that the property damage which occurred on November *879 8, 1970, is excluded from coverage under the collapse hazard provision of the Market policy.
We turn now to a consideration of the policy issued to Taylor's Welding Service by All-Star. The policy contains several provisions which are similar to those contained in the Market policy, but it does not provide completed operations or products liability coverage. The definitions of "completed operations hazard" and of "collapse hazard" in the All-Star policy are identical to those contained in the Market contract.
Although the property damage sustained by plaintiffs occurred during the term of the All-Star policy, the insurer in that policy is not liable because it did not provide completed operations coverage.
All-Star is not liable under the general liability coverage provided in its policy, because under the heading "Exclusions," the policy provides that "This insurance does not apply: ... (m) to bodily injury or property damage included within the completed operations hazard or the products hazard." We have held that the loss sustained by plaintiffs falls within the definition of the completed operations hazard. That loss thus is excluded from coverage under the general liability features of the policy.
We find that the loss sustained by plaintiffs, or by third party plaintiffs, is not covered under the "collapse hazard" provisions of the All-Star policy. The All-Star contract, like the Market policy, provides that "The collapse hazard does not include property damage ... (2) included within the completed operations hazard." Also, under the general liability provision of the policy there is a specific exclusion of "property damage included within the completed operations hazard." These provisions effectively exclude coverage of, and relieve All-Star from liability for, the loss which was sustained by plaintiffs as a result of the collapse of the Pedco boom.
Appellants contend, finally, that All-Star is obligated to "defend or pay" under its policy, because of allegations in an amended third-party petition of Pedco to the effect that an employee of Taylor's Welding Service was negligent in having failed to "warn" Pedco that the weld was defective and that the crane would not lift its rated capacity.
The argument is that Taylor's is protected under the general liability provisions of the All-Star policy (Coverage BProperty Damage Liability) in the event it should become legally obligated to pay property damages because of its employee's alleged failure to warn. Appellants contend that the insured's liability on that ground is not excluded from coverage by any other provision of the contract. They concede that completed operations hazards are excluded from general liability coverage, but they take the position that Taylor's failure to warn does not constitute a completed operations hazard, and that there thus is no exclusion of coverage insofar as this cause of action against Taylor's is concerned. They rely on the case of Cooling v. United States Fidelity and Guaranty Co., 269 So.2d 294 (La.App. 3 Cir. 1972).
In the Cooling case the plaintiff sued his general liability insurer to recover the amount which he had paid for attorney's fees in defending two personal injury suits which had been instituted against him. The personal injury suits were based on Coling's alleged "failure to warn" the purchaser of a diesel engine of the need of installing adequate safety devices on that engine. The defendant insurer in the cited case denied liability on the ground that completed operations and products liability hazards were specifically excluded from general liability coverage. It contended that the alleged "failure to warn" constituted a completed operations or a products liability hazard, and that coverage thus was excluded.
We held that the personal injury suits against Cooling involved "neither a defective *880 product sold nor faulty workmanship," that his alleged failure to warn could not be classified as a completed operations or a products liability hazard, and that the exclusions did not specifically exclude coverage to him under those peculiar factual situations.
We distinguish the Cooling case from the instant suit for two reasons. In the first place, Cooling was seeking only to be reimbursed the amount which he had paid as attorney's fees to defend the personal injury suits against him. The obligation of an insurer to defend its insured is broader than its liability for damage claims. Benoit v. Fuselier, 195 So.2d 679 (La.App. 3 Cir. 1967); American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253 (1970). The issues presented in the instant suit relate only to the insurer's liability for the damages which the insured may become obligated to pay. No question has been raised here as to the insurer's duty to provide a defense for its insured. The Cooling case thus did not determine the issues which are presented here.
Secondly, neither the Cooling case nor the personal injury suits which preceded it involved the sale of defective products or the performance of faulty workmanship. There thus was no relationship between Cooling's alleged "failure to warn" and any conceivable completed operations or products liability hazards. That is not true of the instant suit. This suit does involve allegations of faulty workmanship and a representation made with respect thereto. We have held that the claims against Taylor's are included in the definition of completed operations hazard. There thus is a close relationship between Taylor's alleged "failure to warn" and the completed operations hazard on which the entire claim against Taylor's is based.
We believe that the exclusion of completed operations hazard from the general liability coverage provision in the All-Star policy, had the effect of excluding from coverage the claim asserted against Taylor's based on allegations that its employee had failed to warn Pedco of the defective weld and of the inability of the crane to lift its rated capacity.
Our ultimate conclusion is that the All-Star policy does not provide coverage for the loss sustained by plaintiffs in this case, and that the trial judge correctly dismissed the third party demands against that insurer.
For the reasons assigned, we hereby affirm both of the judgments appealed from. All costs of this appeal are assessed to appellants.
Affirmed.
FRUGÉ, J., dissents with written reasons.
FRUGÉ, Judge (concurring in part; dissenting in part).
I concur with the majority opinion insofar as it affirms the summary judgment in favor of All-Star Insurance Corporation. The completed operations hazard definition in All-Star's policy clearly includes not only liability resulting from the sale of a product, but also liability resulting from the performance of a service. Since there is no statute or public policy prohibiting such a limitation of the insurer's liability, Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958), and Swillie v. General Motors Corp., 133 So.2d 813 (La.App. 3rd Cir., 1961) are thus not applicable to this case. Cooling v. United States Fidelity & Guaranty Company, 269 So.2d 294 (La.App. 3rd Cir., 1972) may also be distinguished from the present case. However, the summary judgment in favor of Market Insurance Company should be reversed, and I respectfully dissent from the majority's opinion insofar as it affirms that judgment.
The Market policy ran from September 12, 1969, to September 12, 1970. Although the alleged wrongful act occurred on August *881 13, 1970, Market contends that there is no coverage under its policy because the damages did not occur until November 8, 1970. The trial judge sustained Market's motion for a summary judgment.
On this appeal, Taylor's Welding Service (hereinafter Taylor's) contends that the rule of law on this point is that the policy which covers the insured at the time of the wrongful act provides coverage for the obligation resulting from this act. Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958); Audubon Coin and Stamp Company v. Alford Safe & Lock Company, 230 So.2d 278 (La.App. 1st Cir., 1969), and Taylor Contracting & Supply Company v. The American Mutual Liability Insurance Co., 163 So.2d 450 (La.App. 2nd Cir., 1964), writ refused, 246 La. 577, 165 So.2d 479 (1964). Market argues that the rule of the cases cited by Taylor's was dependent upon language in the policies before the courts in those cases, and that standard policy language was changed in 1966 to specifically overrule the cases cited by Taylor's. Market contends that the time of loss under the post-1966 policies is the time at which damages occurred.
The policy language relied upon by Market is identical to the pre-1966 policy language in all but two particulars. Although when read out of context, this new language clearly limits coverage to bodily injury or property damage occurring during the policy period, when the policy is read as a whole, the new language conflicts with other provisions of the contract. There is a distinct absence of any language clearly overruling the jurisprudential rules upon which Taylor's relies.
More importantly, the effect of the change in the rule that the time of loss is the time of the tort conflicts with the public policy of this state that the purpose of insurance is to protect the injured person.
The opinions of the courts in Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958); Audubon Coin and Stamp Company v. Alford Safe & Lock Company, 230 So.2d 278 (La.App. 1st Cir., 1969), and Taylor Contracting & Supply Company v. The American Mutual Liability Insurance Co., 163 So.2d 450 (La.App. 2nd Cir., 1964), writ refused, 246 La. 577, 165 So.2d 479 (1964), reveal that they were cited to the majority rule of our sister states that the word "accident" in identical policy provisions meant the time at which damages occurred. The holdings of Louisiana courts thus must have been based upon more than mere policy interpretation. The Louisiana rule thus must have been interrelated with the civil law doctrine of delictual obligations as well as dependant upon the policy considerations discussed supra. The difference between the basic law of Louisiana and common law states as to tort liability adds to the layman's difficulty in understanding a contract which attempts to superimpose the common law theory of tort liability upon Louisiana law relating to delictual obligations.
Under the common law of our sister states, where the result urged by Market obtains, a tort does not create an obligation. A wrongdoer's liability does not accrue until the occurrence of any damages resulting from his wrongful act. However, in Louisiana, as in other civil law jurisdictions, the obligation to repair the harm caused by one's fault, negligence, want of skill, or imprudence arises at the time the wrongful act occurs. LSA-C.C. Arts. 2292, 2315, 2316. For discussion of this distinction, see Litvinoff, 6 La.Civil Law Treatise, §§ 74-75.
This difference in the basic concepts underlying the common law and the civil law to some extent underlies the different results. As can be seen from an examination of the leading cases in the area, the majority rule that the time of damage or injury determines the insurer's liability is dependant upon the common law rule that the insured's liability for a negligent act accrues at the time that the bodily injury or damage occurs. For instance, in Export S. S. Corporation v. American *882 Insurance Company, 106 F.2d 9 (C.A. 2nd Cir., 1939); affirmed on rehearing 108 F.2d 1013, certiorari denied, 309 U.S. 686, 60 S.Ct. 809, 84 L.Ed. 1029 (1940), the plaintiff steamship corporation sued its insurers for indemnification for damages it had paid for tobacco damaged in shipment on one of its steamships. The damage to the tobacco was found to have resulted from its storage next to a product which exuded excessive heat and moisture. The damage began a few days after storage and continued until the tobacco was unloaded. Since Export was insured by one insurer's policy during the first part of the voyage and by another insurer's policy in the latter part of the voyage, the court had to decide which insurer's policy provided coverage. Its basis for assessing to each insurer the proportion of damages resulting during its policy period discloses the rationale behind the majority rule urged by defendant-appellee Market.
"We take it that in a time policy insuring against loss arising from legal liability, the insurer is bound to make the insured whole on losses due to liabilities that accrued against the insured during the term covered by the policy. Conversely, the insurer has no obligation as to losses from liabilities accruing before or after the term. The time of accrual of the insured's liability is the determining factor, not the time of an event which ultimately results in liability. Tulare County Power Co. v. Pacific Surety Co., 43 Cal.App. 315, 185 P. 399, is an illustration. There the defendant insured the plaintiff for one year against loss from claims for damages based on bodily injuries or death. During the year one Bergen was killed because of the plaintiff's faulty installation of wires. The wires had been installed some months prior to the period covered by the policy, and the defendant sought to escape liability on that ground. The court held that the defendant was liable under the policy, the plaintiff's liability having accrued within the policy period." Export S. S. Corporation v. American Insurance Company, 106 F.2d 9, 10 (C.A. 2nd Cir., 1939).
"When did the libellant's liability for cargo damage accrue? Clearly not at the time of stowage of the tobacco. It is certain that there was no liability until actual injury was done to the tobacco. From that time a cause of action against the libellant accrued in favor of the cargo owners. Corporation of Royal Exchange Assurance v. United States, 2 Cir., 75 F.2d 478." Export S. S. Corporation v. American Insurance Company, 106 F.2d 9, 10 (C.A. 2nd Cir., 1939).
While Export S. S. Corporation is more frequently cited for its specific holding, its underlying rationale is apparent in leading cases such as Home Mutual Fire Insurance Co. v. Hosfelt, 233 F.Supp. 368 (D.Conn. 1962); Century Mutual Insurance Company v. Southern Arizona Aviation, Inc., 8 Ariz.App. 384, 446 P.2d 490 (1968); Landerman v. United States Fidelity and Guaranty Co., 25 Conn.Sup. 297, 203 A.2d 150 (1964), and Remmer v. Glens Falls Indemnity Co., 140 Cal.App.2d 84, 295 P.2d 19, 57 A.L.R.2d 1379 (1956).
Just as the development of the common law rule was intertwined with the doctrine that liability for wrongful acts ordinarily does not accrue until damages are incurred, the Louisiana rule was interrelated with the civil law doctrine that the obligation to repair the harm done by one's wrongful acts arises at the time of the wrongful act. In Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958), the defendant Mason had contracted to install a sewage system for the Town of Jena. United States Fidelity & Guaranty Company issued an insurance policy to Mason covering damages caused by him up to $15,000.
While digging trenches and laying pipe for the sewage system, Mason punctured city gas lines at various points and made no effort to repair them, thus allowing gas to flow unchecked into the sewage system. The gas escaped into sewage pipes and into homes.
*883 After the Town of Jena had accepted the contract as complete, the gas in a pipe leading to the Kendrick's home exploded injuring a plumber and completely destroying Kendrick's house. Mason's negligence was found to be the sole proximate cause for the injury and damages, but United States Fidelity and Guaranty denied coverage because Mason did not have completed operations coverage.
Although the opinion in the Kendrick case is dominated by a discussion of completed operations and products hazards, the Supreme Court was very impressed with the fact that the wrongful act occurred during the policy period:
"It must be observed that neither the accident nor the damage resulting therefrom was caused by the sewer system itself, that is, the finished product, but was the direct result of the tort committed by Mason during the performance of his contract and during the life and term of the policy issued by the insurer." Id. at 99 So.2d 114.
Taylor Contracting & Supply Company v. The American Mutual Liability Insurance Co., 163 So.2d 450 (La.App. 2nd Cir., 1964), writ refused, 246 La. 577, 165 So.2d 479 (1964), was an action by a roofing contractor against its insurer. There, the Second Circuit held that if a tort was committed before the policy period began, there was no coverage even though the insured's policy at the time of the damage included the type of loss suffered. At the time Taylor Contracting commenced the roofing job from which the suit arose, it had with American Mutual a comprehensive general liability policy which did not cover property damage liability. Effective November 1, 1961, the policy was expanded to cover "blanket property damage coverage for your roofing operations". The roofing job was completed prior to November 1, 1961, and the roof collapsed on December 9, 1961, after the roofing operations endorsement.
The pertinent policy provisions, as quoted in the dissent were:
"By the terms of the original policy dated August 1, 1961, the American Mutual Liability Insurance Company of Wakefield, Massachusetts, agreed under Coverage B:
`To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.' (Emphasis added)
"Under policy section numbered IV, entitled Policy Period, Territory, it is stated:
`This policy applies only to accidents which occur during the policy period * * *'. (Emphasis added).
"By endorsement No. 5, Amendment of `caused by accident endorsement', Coverage B is amended to read:
`To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of tangible property, including resulting loss of use of such injured or destroyed property, caused unintentionally; provided that as respects injury, sickness, disease, death or destruction resulting from continuous or repeated exposure to conditions over a period of days, weeks or months, such injury results during the policy period and provided further that all damage arising out of such exposure to substantially the same general conditions shall be considered as arising out of one accident or occurrence.'

`Accident', whatever appearing in the policy shall be deemed to include `occurrence'." (Emphasis supplied)
However, the majority did not rely on the language of the insurance contract. *884 Although the majority defined the issue before it a "whether, within the meaning of the insurance contract, the time of installation of the roof or the time of its collapse is determinative of the liability of the insurer", it refused to follow the majority rule of the other American states and relied upon Kendrick v. Mason, supra, in holding that the loss was caused by accident at the time the wrongful act was committed. Since the Second Circuit had before it the same treatises which explain the common law rule as this court was cited to in the instant case, I must conclude that the court was not merely interpreting the meaning of the word "accident". The following language reveals that there was more behind its holding than mere contract interpretationKendrick v. Mason was interpreted to mean that the insurance policy in effect at the time of the wrongful act provided coverage:
"In the Kendrick case the Supreme Court said:

`The policy was issued to fully protect Mason against liability for acts of negligence committed by him during his performance of the contract. The tort which was the proximate cause of the damages sustained by plaintiff was in fact and in law committed during the performance of the construction contract. Both the accident and the injuries resulting therefrom were brought about not from the completed and accepted sewer system but from the direct result of the acts of negligence committed during its construction. The policy covering said accidents for which premiums were charged was then in full force and effect; and the conclusion is inescapable that the insurer is therefore liable in solido with its insured, Mason.'

"It is clear to this court that the King and Kendrick cases determine that the loss was caused by accident at the time the tort was committed and not the time when the damage was sustained or became manifest. (Emphasis ours).
Thus, the Second Circuit held there was no coverage.
The steady progression of this rule of law reached culmination in Audubon Coin & Stamp Company v. Alford Safe & Lock Company, 230 So.2d 278 (La.App. 1st Cir., 1969). Although Audubon involved the insurer's duty to defend, the court had to decide which policy applied to the loss in order to determine whether the specific policy provisions provided coverage, and thus a duty to defend. In 1964, Alford had installed a safe and tear-gas protective device for Audubon. In 1965, the safe was burglarized and the protective device failed to work. A different policy was in effect for each of the two years. Casualty Reciprocal Exchange denied coverage; so after winning the main action, Alford had to proceed on its third-party demand to recover the expenses of defending itself. In deciding which policy applied, the court did not depend upon a definition of the word "accident", rather it held that, "The rule is now established that loss occurs upon the happening of the event giving rise thereto, that is at the time the tort is committed, and not when the loss is discovered or becomes manifest." Id. at pages 279-280.
Thus, the pre-1966 Louisiana cases on point treat the problem before us more as the development of a rule of law external to the parties than as the interpretation of the law between the parties, the contract language.
Louisiana courts did this in the face of the clear majority rule in our sister states that the time of loss under the same type policy is the time when the injury or damage occurs. Thus, while in the common law states the insured has been protected against the accrual of liability during the policy period, in Louisiana the insured has been protected against a delictual obligation arising during the policy period.

I. AMBIGUITY; INTENT
The rules established by the Civil Code for the interpretation of contracts are applicable *885 to insurance contracts. Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111 (1953). Accordingly, when there is anything doubtful in agreements, the courts must endeavor to ascertain the common intention of the parties, rather than adhere to the literal sense of the term, R.C.C. Art. 1950. When a clause is susceptible to two interpretations, it must be interpreted so that it may have some effect, rather than in a sense which would render it nugatory. R.C.C. Art. 1951. All clauses in a contract are interpreted the one by the other, giving to each a sense that results from the entire act, R.C.C. Art. 1955. In a doubtful case, the agreement is interpreted against him who has contracted the obligation. R.C.C. Art. 1957. Since insurance contracts are adhesion contracts, the insurer has a duty to define his obligation clearly, Cooling v. United States Fidelity and Guaranty Company, 269 So.2d 294 (La.App. 3rd Cir. 1972), and all ambiguities are to be construed in favor of the insured and against the insurer. Albritton v. Fireman's Fund Ins. Co., supra. A fortiori, any change in policy language which purports to overrule the settled jurisprudence of the state should do so in clear unmistakable terms.
When the prospective insured or his attorney is presented with a policy which will provide coverage in a manner contrary to the previous practice and jurisprudence, he should be able to ascertain the prospective coverage and protection with certainty and not be forced to rely upon the good faith of the insurer or the chance that the courts will interpret the policy as the insurer presents it to him. Any change, in fact all policy provisions, should be clear and subject to interpretation without any doubt. The policy language which Market contends changes the Kendricks-Audubon rule not only makes the contract ambiguous; it is very similar to pre-1966 policy language (quoted supra, page 878.). Market agreed under coverages A and B to:
"pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of coverage A. Bodily Injury, or coverage B. Property Damage, to which this insurance applies, caused by an occurrence...."

* * * * * *
However, on the last line of the page, the policy states:
"This insurance applies only to bodily injury or property damage which occurrs during the policy period...."
Five printed pages later occurrence is defined as:
"an accident including injurious exposure to conditions, which results during the policy period, in bodily injury or property damage...."
There are only two real changes in the policy language. (1) In "Policy Period. Territory", the words "bodily injury or property damage" replace the word "accident." (2) The definition of occurrence has been changed. In the pre-1966 policy, the words "accident" and "occurrence" were interchangeable.
The meaning of the policy language and the intent of the parties is more easily ascertained when the contract is examined in light of the circumstances surrounding the transaction. Taylor's Welding Service, Inc., is a corporation engaged in welding repair work both on and off its own premises, on vessels, on offshore rigs, on docks, on cranes, and on any type of oilfield equipment. Its president, Larry Taylor, bought insurance in order to protect the corporation from any liability resulting from the negligence or want of skill of himself or his employees while engaged in business operations (Affidavit, T-88). The most important objective manifestation of his intent to purchase coverage for any liability resulting from any wrongful acts, regardless of the time damages occurred, is that the wording of the exclusion *886 which he paid extra to incorporate into the policy contemplated a time lag. Completed operations coverage must be specifically applied for and an additional premium must be paid to obtain it. Pursuant to this additional coverage, the policy would pay for injuries resulting from completed operations "only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured". Market was informed by Taylor's application that it was engaged in welding operations. The nature of welding operations dictates that there will be a substantial interval of time between any negligent weld and the manifestation of the defect in an event and possible bodily injuries or property damage. This fact in combination with the obvious forward or prospective look of the clause reveals the intent of the parties to cover bodily injury or property damage that occurs in the future.
However, Market argues that the policy only covers injury occurring during the policy period. The language of Section IV on this point flatly contradicts the obvious intent of the parties as revealed by the completed operation hazard definition. The effect of the time lag between wrongful act and accident contemplated by the completed operations definition is that Taylor had no coverage (under the new rule Market has urged upon us) during the policy year for any negligent act which would culminate in an accident after the policy period. Market is in the position of arguing that when its policy said Market would protect Taylor for events which occurred in the future, i. e., after a time interval, and resulted from wrongful acts; its policy meant that Market would insure Taylor for events which occurred after a time interval from acts committed in the past. Such contradictory policy provisions at least render the policy as a whole ambiguous.
Had Taylor asked the advice of an attorney before buying the policy, his attorney would have been faced with contradictory policy provisions also. The first words of the policy indicate that the insurer will pay on behalf of the insured any sum which the insured shall become legally obligated to pay as damages. This language conforms perfectly to Louisiana's Civil Law doctrine that the obligation to repair the damage caused by one's wrongful act arises at the time of the wrongful act. This, added to the jurisprudence reviewed above, would lead one to think that any obligation incurred by a wrongful act which comes within the policy provisions is covered regardless of when the injury occurs. However, the next clause in the same provision reads "caused by an occurrence." As occurrence is defined above, the accident must result in bodily injury or property damage during the policy period before there is coverage. This direct conflict with the prior portion of the provision constitutes an ambiguity. Accordingly, these ambiguities should be construed against Market to provide coverage for Taylor. Moreover, the meaning of the contract as a whole is to provide coverage for Taylor in this instance. R.C.C. Arts. 1955, 1957; Albritton v. Fireman's Fund Ins. Co., supra.

II. PUBLIC POLICY
The public policy of this state is that liability insurance policies are for the protection of injured persons. Musmeci v. American Automobile Insurance Company, 146 So.2d 496 (La.App. 4th Cir., 1962).
The interpretation urged by Market would put the insurer in a very good position. In this situation the company is in reality looking back to see if its insured had incurred any liability for which it will be liable if the insurer issues a policy. The first year Taylor was in business the inurer could be liable for no past wrongs, and it is very unlikely that, with the time lag involved, there would be damages the first year resulting from defects the first year. In subsequent years, since there is a time lag, the company can cancel its policy if it learns of any negligent work performed *887 by the insured before the property damage or bodily injury occurs. The insurer is put on notice of this negligence by the first claim made on its policy. The insurer can collect premiums and then cancel its policy before claims resulting from wrongful acts committed during the policy period are filed. See, for example, Protex-A-Kar Co. v. Hartford Accident and Indemnity Co., 102 Cal.App.2d 408, 227 P.2d 509 (1951). Its business thus changes from that of providing a means for the distribution of risk to that of taking premiums only from those on whom there will be no claims. The insured is not the only person on whom this creates a burden.
Persons who deal with small businessmen must depend upon their being insured as this is their only assurance of being repaid for any defective work. The only opportunity to ascertain if a businessman with whom one deals is insured is to see if he is insured at that time. Thus, the public, under the rule urged by Market, would be forced to gamble that any injury arising from their dealings with the insured would occur at a time when he was covered by some policy.
The policy of this state that insurance is to protect the injured person would better be served by making the time of loss dependent upon the type of loss insured against. For instance, in disability, medical, and life insurance the insured is seeking, and the purpose of the insurance is, to protect against the happening of an event. The time of loss under such policies should therefore be the happening of this event. On the other hand, one seeking comprehensive general liability insurance is attempting to insure himself against liability for the things he does during the policy period. This is particularly true of one seeking the professional liability insurance. Damages arising from negligence or un-skilled services of a professional many times arise more than one year after the wrongful act. The best examples of this are the cases of attorneys, engineers, architects, and contractors. The public would not be protected in their dealings with these persons under the holding of the majority. The time of loss under such policies should therefore be the time when the wrongful act was committed.
Market argues that the rule accepted by the majority is justified because under it the insurer accepts liability for all past negligence of the insured. As discussed infra, this takes the insurer out of the insurance business in its purest form. However, the greatest danger in this rule is illustrated by the insurance contracts involved in Livingston Parish School Board v. Fireman's Fund American Insurance Company, 263 So.2d 356 (La.App. 1st Cir., 1972), and J. M. Brown Construction Company v. D & M Mechanical Contractors, 222 So.2d 93 (La.App.1st Cir., 1969). These cases held that policy provisions limiting the insurer's liability to damages occurring during the policy period are valid. These cases are distinguishable from the present case on their facts because the policy language involved is clear and understandable. However, they are contrary to this dissenting opinion in that they find no public policy reasons against such a limitation of liability. The policy in Livingston Parish School Board required that the insured have insurance with the same company in both the year of the wrongful act and the year of the loss before there would be coverage. In Brown Construction Company, the insured was required to give written notice of any act which might subsequently give rise to liability. The results of such notice are apparent. Thus, under such policy, there is no coverage if the wrongful act occurs during the policy period and the damages occur later. There is also no coverage if the damages occurred during the policy period, but the insured was not insured by that company when the wrongful act occurred. There is also the distinct possibility that any notice given as required by the policy will result in cancellation of the policy or in refusal to renew a policy before a claim can be made. Coverage under such policies is illusory at best; the *888 public is not protected. Therefore, the public policy of this state that insurance is to protect the injured person prohibits insurers from limiting their liability in the manner in which Market proposes to do so here.
For the foregoing reasons, I respectfully dissent from the holding of the majority insofar as it affirms the judgment in favor of Market Insurance Company, and against Petroleum Distributing Corporation and Tesoro Petroleum Corporation.