385 So.2d 928 (1980)
Bobby HUNTER and Gail Hunter, Plaintiffs-Appellees,
v.
OFFICE OF HEALTH SERVICES AND ENVIRONMENTAL QUALITY OF the DEPT. OF HEALTH & HUMAN RESOURCES of the State of Louisiana, Third Party-Plaintiff-Appellant, and
Frances Everett Brander, Individually and as Representative of those Certain Underwriters at Lloyds, London and Louisiana Dept. of Health, Maintenance and Ambulatory Patient Services, et al., Defendants-Appellants.
No. 14170.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1980.
Rehearing Denied July 24, 1980.
*930 Cook, Yancey, King & Galloway by Herschel E. Richard, Jr., Shreveport, for defendants-appellants Frances Everett Brander, individually and as Representative of those certain underwriters at Lloyds, London and Louisiana Dept. of Health, Maintenance and Ambulatory Patient Services, et al.
H. M. Westholz, Jr., New Orleans, Lunn, Irion, Switzer, Johnson & Salley by Charles W. Salley, Shreveport, for third party-plaintiff-appellant Office of Health Services and Environmental Quality of the Dept. of Health and Human Resources of the State of La.
David A. Rothell, Mansfield, for plaintiffs-appellees Bobby Hunter, Yolanda Hunter and Christopher Hunter.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendant-appellee Continental Cas. Co.
Mayer, Smith & Roberts by Charles L. Mayer, Shreveport, for defendant-appellee St. Paul Fire & Marine Ins. Co.
Before PRICE, JASPER E. JONES and FRED W. JONES, JJ.
En Banc. Rehearing Denied July 24, 1980.
PRICE, Judge.
This medical malpractice litigation arises out of the failure of a pathologist at the state laboratory in New Orleans to properly diagnose a malignant melanoma in the specimen of an excised mole submitted for analysis by a physician in DeSoto Parish in connection with his treatment of Mrs. Gail Hunter.
Mrs. Hunter and her husband, Bobby Hunter, filed this suit in DeSoto Parish against the Division of Health, Maintenance, and Ambulatory Patient Services of the State of Louisiana for damages resulting from the alleged negligence of the pathologist, Dr. William J. Nothacker, who was alleged to be an employee of the state agency. The other party defendants are: St. Paul Fire & Marine Insurance Company, the insurer of Dr. Nothacker; Certain Underwriters at Lloyds, the insurer of the state; and Continental Casualty Company, the alleged excess insurer of the state.
*931 Gail Hunter died after the suit was filed and Bobby Hunter, individually and as tutor of their two minor children, was substituted as party plaintiff to continue the survival action. Additional claims for damages were made by these plaintiffs for the wrongful death of their wife and mother.
In preliminary proceedings the trial court overruled the state's exception of venue. The court granted plaintiffs' request for a jury trial as to their claims against the insurers, but held that the claims against the state should be decided by the trial judge. It was also agreed by the parties that certain questions of insurance coverage concerning Continental Casualty Company would be determined by the trial judge rather than submitted to the jury.
The jury found for plaintiffs and awarded damages in the amount of $432,000. The trial judge found the state was also liable in solido to plaintiffs for this amount.
The trial judge further found Continental Casualty did not have excess coverage which was applicable to this case and rejected plaintiffs' demand as against this insurer and denied the state's third party demand against this party.
The trial court therefore cast the state solidarily liable with St. Paul and Underwriters at Lloyds, with each of these insurers' liability being limited to the policy coverage of $100,000. The state and Underwriters at Lloyds have appealed. St. Paul satisfied the judgment as against it and did not appeal. Plaintiffs have answered the appeal and request an increase in the award for damages.
The facts pertinent to an understanding of the issues are substantially as follows:
In 1971 Gail Hunter, who was then 29 years old, had a mole removed by Dr. Jacob Segura, a general practitioner in Mansfield. Dr. Segura sent the specimen to the state laboratory in New Orleans for a biopsy. He received a response some seven days later which diagnosed the specimen as "pigmented nevus, compound type," indicating it was benign or not cancerous. No further treatment was therefore given in connection with the removal of the mole. Approximately three years later in April 1974, Mrs. Hunter discovered a large knot under her right armpit which was surgically removed by Dr. Jack Grindle, a surgeon in Mansfield. Pathological examination of the excised mass of lymph nodes resulted in a diagnosis of metastic malignant melanoma (cancer which has spread). In the search for the primary site of the cancer, the slide of the 1971 mole specimen sent to the state laboratory was recovered and reexamined. This resulted in the disclosure that an erroneous diagnosis had been made by the state pathologist in his biopsy of the mole and that the correct diagnosis at that time should have been melanoma.
After the April 1974 diagnosis of malignant melanoma, treatment was ineffective and Mrs. Hunter died in December of that year.
The numerous issues presented on this appeal as developed by appellants' specifications of error and plaintiffs' answer to the appeal are as follows:
(1) Have plaintiffs carried the burden of proof to show the erroneous diagnosis was causally related to Mrs. Hunter's death?
(2) Is the award of damages excessive as contended by appellants or is it inadequate as contended by plaintiffs?
(3) Did the trial court err in admitting the deposition of plaintiffs' expert witness, Dr. Cyril H. Wecht, in view of the protective order issued precluding the presence of appellants' expert to assist in the examination of this witness at the taking of the deposition?
(4) Did the trial court err in refusing to give jury charges requested by appellants relating to plaintiffs' burden of proof in a medical malpractice suit?
(5) Did the trial court err in overruling the exception to the venue by the state?
(6) Was the trial court in error in finding Continental Casualty Company did not have excess liability coverage which was applicable to this event?
*932 We shall discuss these issues in the order as stated above.
1. THE ISSUE RELATING TO PLAINTIFF'S BURDEN OF PROOF
The burden of proof required by a plaintiff in a medical malpractice case is provided by La.R.S. 9:2794 which has retroactive application to cases pending prior to its enactment in 1975.
There is no question that plaintiffs have satisfied the requirements of paragraph A(1) and (2) as they clearly have shown the standard of care ordinarily exercised by pathologists in examining tissue samples in this state and that Dr. Nothacker did not exercise this degree of care in the diagnosis made by him in 1971.
The issue as posed by appellants' assignment of error is whether plaintiffs have sustained the burden provided by subparagraph (3) of the statute which requires proof "that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." Appellants contend that under this section of the statute plaintiffs must prove by a preponderance of the evidence that the failure to diagnose the melanoma in 1971 resulted in the death of Mrs. Hunter. They contend the overall preponderance of medical testimony does not show with a degree of medical certainty that Mrs. Hunter would not have died even had she received a correct diagnosis and been given the prevailing medical treatment of that period.
Plaintiffs principally rely on the testimony by deposition of Dr. Cyril H. Wecht, a pathologist of Pittsburg, Pennsylvania, who was of the opinion that the misdiagnosis of the original skin lesion in 1971 was directly and causally related to Mrs. Hunter's death. His opinion was based on the assertion that had a correct diagnosis been made, and following recognized standards of treatment at that period in time, she would have been immediately referred to a surgeon who would have performed a wide angle excision of the skin surrounding the mole site and most probably a lymph node dissection extending into the axillary or armpit area. Dr. Wecht concluded that had Mrs. Hunter been afforded the opportunity of such treatment her chances for survival would have been increased by 85 percent based on recognized medical statistics. Without the treatment he opined her chance of survival became almost zero.
Appellants offered the testimony of three physicians: Dr. Richard J. Reed, a pathologist and professor at the Tulane School of Medicine in New Orleans; Dr. James H. Eddy, Jr., a surgeon in Shreveport; and Dr. Jack Grindle, the surgeon who attended Mrs. Hunter in 1974. Dr. Reed and Dr. Eddy were of the opinion that a wide angle excision would not have been of any benefit to Mrs. Hunter as their examination of the slide of the 1971 specimen shows the margin of tissue surrounding the mole was free of cancer cells and there was no local reoccurrence of the melanoma at the original mole site.
Whether Mrs. Hunter would have died when she did even though her cancer had been promptly diagnosed in 1971 and some or all of the known treatment administered to her is a question on which experts could understandably disagree in view of the apparent, yet incomplete, medical knowledge of this disease.
Prognosis for recovery is basically evaluated by statistical data relating to the recovery rate of those patients who have responded to known treatment after prompt diagnosis. This is well illustrated by the testimony of appellants' witness, Dr. Grindle, on cross-examination:
Q. Dr. Grindle, when you were asked to predict whether Mrs. Hunter would be alive or not or whether a wide angled excision would have made any difference that is almost as difficult as predicting whether you are going to be alive next year, isn't it?
A. That's right.
Q. You just play the odds, is that correct?
A. That's right.
*933 Q. I believe you would concede however that wide angle excision would be necessary treatment in a case such as hers, is that correct?
A. If it were mine I would rather have it.
Q. Doctor, if you had lymph malignant melanoma and didn't treat it, for whatever the reason, what chance would you have to survive?
A. Very, very faint, I mean the chances are practically nil. But as pointed out occasionally you will find a case, I think there is 8, 10, or 12 cases in literature, apparently spontaneous regression.
Q. That is an exception to the rule isn't it?
A. Yes, sir.
Q. Out of all the people in the country that has had this maybe eight has had this happen to them?
A. Yes, sir.
Q. So essentially if you take a tumor out and you miss a cell, or for whatever reason the cells are left in the body, and there is no treatment whatsoever is administered to the patient they have very little chances for survival?
A. That's correct.
To sustain their burden of proof under the circumstances as here presented, plaintiffs should only have to show by believable evidence, that the erroneous diagnosis caused Mrs. Hunter to fall from the category of persons who would statistically have been expected to survive to the category in which there was almost no chance of survival. This is all that could reasonably be expected of plaintiffs. To prove that she would not have died otherwise is an unreasonable burden.
Although there is a difference in the opinions of the medical experts presented, and appellants are favored with a greater number to support their position, the opinion of plaintiffs' expert, Dr. Wecht, standing alone is sufficient to carry the burden of proof if it was found more credible by the trial court and jury and this finding was not manifestly erroneous. The record shows Dr. Wecht to be a well recognized and experienced pathologist whose opinion has been accepted many times in courts nationwide. We do not find any error on the part of the jury in giving his opinion greater weight in this instance. We therefore find that the jury and trial judge were not clearly wrong in finding that the erroneous diagnosis was a substantial factor in the cause of Mrs. Hunter's death.
2. QUANTUM
Appellants contend the trial court's award of $432,000, to be divided equally among Mr. Hunter and the two children, was excessive; whereas appellees request the award be increased to include approximately $154,000 for loss of Mrs. Hunter's services to her family.
We will first address the issue of the excessiveness of the award. As a general guideline when considering whether a trial court's award is inadequate or excessive, the Supreme Court in Cheatham v. City of New Orleans, 378 So.2d 369 (La.1980) mandates that:
The law on the issue of appellate review of damages is contained in La.Const. of 1974, art. V, § 10(B)8 and La.Civ.Code art. 1934(3).9 This Court has consistently
8 La.Const. of 1974, art. V, § 10(B) provides the scope of review for appellate courts as follows:
"Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts."
9 Louisiana Civil Code Article 1934(3) provides in pertinent part:
"Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party....
In the assessment of the damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none ...." (Emphasis added)[*] *934 held that Article 1934(3) does not violate the constitutional provisions of La.Const. of 1974, art. V, § 10. Revon v. American Guaranty and Liability Insurance Company, 296 So.2d 257 (La.1974). In interpreting Article 1934(3) this Court held in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976):
"before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award.... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.... It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." (citations omitted)
In the instant case we must decide if the evidence supports an award of $432,000 as being reasonably within the discretion provided the trial judge and jury. Unfortunately, the award given was made in globo leaving this court without benefit of an itemized list of the damages awarded plaintiffs. Nevertheless, we will attempt to estimate what award was given for each element of damages.
Plaintiffs requested a sum of $37,500 for decedent's pain and suffering and we will assume this amount was awarded them. The evidence clearly shows Mrs. Hunter to have suffered a great deal of pain and discomfort during the period after diagnosis to the point of her demise. We therefore cannot say this award was unreasonable nor outside the court's discretion.
With regard to plaintiffs' loss of support, plaintiffs relied on the testimony of Dr. Seymour S. Goodman, professor of economics at Tulane University in New Orleans. Dr. Goodman's calculations were based on the assumption Mrs. Hunter was earning a gross income of $9,831.41 annually. To obtain this figure, Dr. Goodman took an average of Mrs. Hunter's annual base earnings from 1971 through 1974. After making several adjustments based on various governmental tables and statistical reports indicating her work life expectancy to be 27.4 years, inflation and promotional increases to total 5.51% per annum, employer contributions for pension fund and hospitalization benefits and a 17.4% deduction for her personal expenditures and discount rates of 63/8%, the economist concluded a sum of $268,817.08 would compensate plaintiffs for the loss of support previously provided by Mrs. Hunter.
Appellants did not present a counter expert witness, but did cross-examine Dr. Goodman extensively. They complain that Dr. Goodman's analysis was faulty on the basis he used gross income instead of net, and while considering inflational factors and wage increases, he made no allowances for income taxes.
Similar allegations were made in the Cheatham case, supra, where the trial court made an award of $279,000 for loss of support in a wrongful death action to the wife and child of a man who earned approximately $9,600 annually. The court of appeal reduced the award and the Supreme Court reinstated it stating:
While the economist's calculations may not have taken into account the difference in Cheatham's anticipated gross pay and his net pay, principally income tax and social security tax withholdings (a relatively small sum considering the fairly meager pay range) there were the offsetting considerations for the jury that the economist used a mere 3% inflation increase factor (and it has been as high as 13% of late), he did not take into account as part of the income the 5% commission Cheatham was earning in his job, and he used a 30% consumption factor (for a family of two) rather than 26% which his *935 tables indicated was the appropriate percentage for a family of three.
In light of the language in Cheatham and in view of the facts of this case, we find an award somewhere in the range suggested by Dr. Goodman would not be an abuse of the discretion given the trier of facts.
Appellants attempt to limit an award to plaintiffs for loss of love and affection to a range of $35,000 to $90,000. Again we look to Cheatham where the Supreme Court upheld an award of $200,000 to the surviving spouse and $125,000 to the minor child for loss of a husband and father's love and affection. In doing so the court reversed the court of appeal which had reduced the sums to $50,000 and $25,000 respectively.
We find the evidence portraying the family unity of the Hunters to be similar, if not more convincing than the evidence presented in the Cheatham case. Although the awards in Cheatham may have been high the court found them within the discretionary range and could not say the jury erred.
We are unable to state with any certainty what award was given plaintiffs for the loss of love and affection of decedent. However, any award close to that given in Cheatham for such loss would almost equal the total damages awarded in this case.
Next to be considered is whether this court should increase the award to include the value of Mrs. Hunter's household services. Some evidence was presented showing the value of a wife's household services based on published articles. However, the evidence failed to show plaintiffs had actually incurred any expenses of obtaining someone to render these services for the Hunter family. Therefore, we find no merit in appellees' contention that the award should be increased.
We conclude the jury and trial court did not abuse their discretion by awarding plaintiffs a total sum of $432,000 in damages and therefore affirm the award.
3. ADMISSIBILITY OF DR. WECHT'S DEPOSITION
Appellants complain the trial judge improperly admitted into evidence the deposition of Dr. Wecht. Appellants based this complaint on the fact a protective order was given to appellees preventing any other witnesses from attending the deposition. Appellants contend C.C.P. Art. 1631 precludes a court from sequestering another expert witness. While it is customary in Louisiana to exempt experts from the rule of sequestration, the court has the authority to do so where the expert witness is expected to testify as to facts in addition to opinion. Hopkins v. Dept. of Highways, 350 So.2d 1271 (La.App. 3d Cir. 1977); McPherson v. Catahoula Parish Police Jury, 358 So.2d 685 (La.App. 3d Cir. 1978). Since the medical witnesses involved in this case examined the slide of the mole specimen and testified to the facts found therein, we believe the above cases are applicable. Furthermore, the deposition of Dr. Wecht took place eight months prior to the trial, which in our opinion, gave appellants more than ample opportunity to refute the evidence presented in Dr. Wecht's deposition.
4. DENIAL OF REQUESTED JURY CHARGES
Appellants contend the trial court erred in failing to give four requested charges to the jury. The first concerns the definition of the burden of proof required of a plaintiff in a medical malpractice suit. The second relates to the degree of certainty in the evidence to show a causal relationship in the act of negligence alleged and the injury to Mrs. Hunter.
We find the trial judge properly instructed the jury in both of these areas of law and that he did not commit error in refusing to give the specific charges requested by appellants.
The third instruction complained of was a request to define damages for loss of wages to restrict any consideration to net rather than gross wages. The fourth complaint is the failure of the court to instruct the jury that the failure of plaintiff to call a doctor who administered treatment as a witness creates the presumption his testimony would have been unfavorable.
*936 The latter two requested instructions were not covered by the trial court's charge. However, our independent review of the evidence leads us to the conclusion that the evidence supports the verdict reached by the jury and the failure to give these two special instructions does not justify a remand and retrial of the case. See Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3d Cir. 1975); Bartholomew v. Travelers Insurance Co., 290 So.2d 390 (La.App. 4th Cir. 1974); Bryant v. St. Paul Fire and Marine Ins. Co., 272 So.2d 448 (La.App. 2d Cir. 1973).
5. VENUE
Appellants specify as error the trial judge overruling their exception of improper venue. We find C.C.P. Art. 74 to be applicable in this case. This article provides for an action on offense or quasi offense to be brought in "the parish where the wrongful conduct occurred," or in "the parish where the damages were sustained." The record clearly shows the damages were sustained in DeSoto Parish, domicile of Mrs. Hunter, and therefore the trial judge correctly disposed of the issue.
6. EXCESS COVERAGE OF CONTINENTAL CASUALTY COMPANY
The state has assigned as error the holding of the trial judge that Continental Casualty did not afford excess liability coverage for the claims of plaintiffs in this case.
The state's primary contention is that the excess policies issued by Continental to the state during this time frame contain ambiguous language which should be construed against the insurer. The two policies of Continental in question were issued to cover the periods of October 27, 1970 to October 27, 1971, and from October 27, 1971 to October 27, 1972. After October 1972 another insurer, Market Insurance Company, carried the excess liability for medical malpractice for the state. The coverage in each instance was excess to primary liability coverage furnished by Lloyds in the amount of $100,000. Each of the Lloyds' certificates of insurance is identical and provides for malpractice coverage in the following language:
NOW WE THE UNDERWRITERS hereby agree, ... to pay on behalf of the Assured all sums which the Assured shall by law be held liable to pay for damages arising out of bodily injury or mental injury to or death of any patient caused by or alleged to have been caused by error, omission, or negligence in professional services rendered or which should have been rendered ...,
PROVIDED ALWAYS THAT
(a) such Malpractice results in a claim being made against the Assured during the period of insurance as stated in the Schedule ....
As the negligence of the state's pathologist happened in 1971, the state in answer to plaintiffs' interrogatories declared it had primary liability coverage with Lloyds under certificate No. ISU-3441, which covered the period of October 27, 1970 to October 27, 1971. The state also answered that it had excess coverage with Continental whose policy was issued for this time frame and specified it was excess to this Lloyds' certificate. Pursuant to these answers the plaintiffs made Lloyds and Continental defendants by supplemental pleadings. Continental did not at this time deny coverage but proceeded to defend the action along with the defense being made by Lloyds. Some five years later, just nine days before the case was fixed for trial, Continental notified the state through its then counsel of record, that it had just discovered in pre-trial preparation that neither of its policies of excess coverage previously issued to the state were applicable to this case.[1] The basis on which coverage was denied was that the underlying insurance provided by Lloyds were "claims made policies,"[2] and as *937 no claim was made by plaintiffs during the period between October 1970 and October 1972 when Continental was the designated excess insurer, there was no coverage under its policies.
The state contends that because a "claims made" provision is unusual and is confusing to the insured, and in view of the ambiguous language of the Continental policies, it should be determined that Continental was the excess insurer. The principal basis for this argument is that the declarations page of the policy indicates to the insured it has coverage for the policy period October 27, 1970 to October 27, 1971, for "injury or destruction taking place during this policy period...." The state contends this leads the policyholder to believe it has coverage for any negligent act of an employee happening between October 1970 and October 1971.
The state also contends the Lloyds' policies should not be considered in interpreting Continental's policies as they were not made a part of the policies as required by La.R.S. 22:628 and under the decision in Spain v. Travelers Insurance Company, 332 So.2d 827 (La.1976).
Spain forbids the incorporation of another policy by reference unless the policy referred to is physically attached or made a part of the policy. As it appears the Lloyds' certificates were attached to the Continental policies at the time of delivery, this is a sufficient compliance with R.S. 22:628 and Spain.
From our examination of the subject policies we do not find the ambiguity as contended by the state on the critical question as to which primary policy the Continental policies provide excess coverage for.
The excess policy of Continental in each instance provides clearly on the first page or cover sheet that it is excess to a specific policy of underlying insurance. It also provides under Part 1 that "the provisions of the immediate underlying policy are incorporated as a part of this policy...."
The language of Continental policies makes it plain that the policy covers nothing more than that afforded by the immediate underlying policy which is specifically described in the Schedule of Underlying Insurance contained on the face of the policy. The attached copy of the Lloyds certificate declares in bold type in the subheading of the section providing for malpractice insurance that it is a "claims made policy." The policy language also clearly restricts its applicability to a claim being made during the period of the policy. This may well be an unusual provision but this does not render it ambiguous or subject to more than one interpretation.
The state also contends that Continental, by acting as though it had coverage up until a few days before trial, is now estopped from denying coverage. The state entered this litigation under an erroneous state of facts as to its primary and excess coverage and the actions of Continental in indicating they afforded coverage in answer to pleadings or interrogatories and in engaging in defense of the actions for such a long period of time did further mislead the state in its confusion as to a state of facts which did not exist.
However, the general rule is that estoppel is not favored in our law. Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975). The application of the doctrine of estoppel has not been allowed in the field of insurance law in this state to extend or enlarge coverage beyond that set forth in the policy. Ledoux v. Old Republic Life Ins. Co., 233 So.2d 731 (La.App. 3d Cir. 1970); Smith v. Republic National Life Ins. Co., 335 So.2d 739 (La.App. 2d Cir. 1976). To grant the plea of estoppel as requested by the state would in effect be an extension of coverage *938 of the Continental policies. In view of these recognized principles equitable estoppel is not proper under the circumstances presented.
We find no error in the trial judge's finding that the excess coverage was afforded by the policy issued by Market Insurance Company and not the policies of Continental Insurance Company on the claims presented in this case.
For the foregoing reasons, the judgment appealed is affirmed at appellants' costs.
NOTES
[*] The above footnotes numbered 8 and 9 are part of the quoted material.
[1] After the state was denied a continuance of the trial date in view of this late development on the issue of insurance coverage, it filed a third party demand against Continental for a declaratory judgment as to Continental's coverage and pled the doctrine of equitable estoppel.
[2] There are two types of policies recognized in Louisiana. The most common is the policy written on an "occurrence basis"that is the injury or property damage must occur during the policy period. The other is the "claims made basis"that is to say the time when the damage happened is not controlling, but the time a claim is made or the damage is discovered is the critical factor for determination of coverage within the policy period. See Oceanonics, Inc. v. Petroleum Distributing Company, 280 So.2d 874 (La.App. 3d Cir. 1973) and Dement v. International Paper Co., 363 So.2d 952 (La.App. 3d Cir. 1978).