289 So.2d 237 (1973)
Melvin E. MUT
v.
NEWARK INSURANCE COMPANY et al. No. 9618
William H. McDOUGALL et al.
v.
STEEL BUILDERS, INC., et al.
No. 9619
Court of Appeal of Louisiana, First Circuit.
December 17, 1973.
Rehearing Denied February 11, 1974.
Writs Refused March 15, 1974.
*240 Daniel R. Atkinson, Baton Rouge, for Steel Bldg. & Tony Maluski.
Henry D. Salassi, Jr., Baton Rouge, for Melvin Mut.
Bart Eaton, Baton Rouge, Louis Selig, for McDougall & Newark Ins.
Horace C. Lane, Baton Rouge, for Reo Construction.
John R. Tharp, Baton Rouge, for Travelers & Phoenix Ins.
James F. Abadie, Baton Rouge, for Allen & Rufus Lavergne-Lavergne Bros. Contr., for appellee.
Before LANDRY, ELLIS and PICKETT, JJ.
LANDRY, Judge.
Numerous appeals were taken in these consolidated cases from judgments which: (1) Award Plaintiff, Melvin E. Mut, recovery of damages to his building caused by the collpase of a wall of an adjoining building belonging to William H. McDougall and Louis Selig, Jr. (Owners), the insureds of Newark Insurance Company (Newark); (2) Grant Owners recovery from Steel Builders, Inc. (Contractor), prime contractor on the building which failed, of the cost of repairing the fallen wall and the additional cost of curative work required to meet local building code specifications; (3) Deny Contractor's claims of coverage as to both buildings by Contractor's insurers, Phoenix Insurance Company (Phoenix), who insured Contractor during the building process, and Travelers Insurance Company (Travelers), who insured Contractor on the date the wall collapsed; (4) Deny Contractor's claim of indemnity from subcontractor, Reo Construction, Inc. (Reo), and (5) Deny numerous reconventional demands by and among the above named parties as well as Allen R. and Rufus L. Lavergne, d/b/a Lavergne Brothers (Lavergne), subcontractors of Reo who performed certain labor on the original construction.
It is undisputed that in 1968-1969, Contractor erected a steel frame building for Owners in the City of Baton Rouge on property belonging to Owners and bounded on the east by land belonging to Mut, on which Mut had previously erected a warehouse type building approximately two feet from Mut's west line. Owners' building was planned by Contractor's Vice-President, Tony E. Maluski, graduate engineer, after consultation with Owners and Owners' tenant, Standard Brass Company (Standard), for whose use the building was expressly designed. Contractor concedes the contract contemplated a building complying with local building code requirements of the city. The building consisted of a steel frame structure 150 feet long, 60 feet wide and 22 feet high, the east and west end walls to be constructed of concrete building blocks. The sides and roof were apparently to be of metal.
For reasons suiting Owners' convenience, it opted to build the structure on Owners' east line. After consultation with Mut, Owners built on the line with Mut's permission and with the understanding no expense therefrom would result to Mut. Plans for Owners' building were duly filed with and approved by local governmental building authorities prior to commencement of construction. The plans called for six steel I beam columns across the rear or east end wall of Owners' building. According to the plans, these beams or columns were irregularly spaced across the *241 east end to support the steel superstructure of the building and incidentally to provide some lateral support for the block east end wall as hereinafter noted. The east wall did not constitute a structural portion of the building; its prime purpose was to enclose the building; it did not afford any support for the roof or superstructure. The plans provided for bracing the east wall with wall ties formed of double nutted U bolts secured into the six I beam columns at four foot intervals commencing from the foundation upward. The bolts were to be inserted through holes burned into the columns, secured by nuts on the inside of the building, and extend into the cores of the wall blocks at the proper courses. Included in the building for Standard's use was a three ton overhead crane mounted on a rail extending from the front to the rear of the building.
Contractor assumed full responsibility for completion of the work according to contract terms and specifications, including the making of the required final inspection and doing all necessary to obtain an occupancy permit upon completion of the work. Contractor subcontracted to Reo Construction, Inc. that portion of the work relating to excavation, fill, backfill, reinforcing concrete work and constructing the end walls of the building. Contractor was obligated to indemnify Owners against all claims arising from any defects in workmanship and materials. The subcontract between Contractor and Reo contained an indemnity agreement in favor of Contractor. Reo, in turn resubbed to Allen R. and Rufus L. Lavergne, d/b/a Lavergne Brothers (Lavergne), the work of laying the concrete blocks on the east and west walls, including the insertion of wall ties into the mortar joints at the required courses. Lavergne's agreement provided for furnishing labor only, and contained an indemnity clause in favor of Reo.
During construction, Reo's representative, Ray Roussell, who died prior to trial, discussed the matter of wall ties with Maluski. For reasons hereinafter explained, Maluski approved a change in the type of wall tie from the U bolts specified in the plans to a 22 gauge 7/8ths inch wide corrugated wall tie to be inserted in the mortar joints at the end walls every second course of blocks and welded to the sides of the end I beam columns inside the building upon completion of the walls.
By March 1, 1969, the building was completed and occupied by Standard. While construction was in progress, Contractor was insured against general liability by Phoenix pursuant to a policy effective April 1, 1968 to April 1, 1969. The east wall collapsed March 25, 1971, on which date Contractor's general liability was carried by Travelers. The 22 foot wall collapsed at a point about 9 feet above the building foundation, the failure occurring across the entire 60 foot width of the structure. The falling debris damaged the roof and west wall of Mut's adjoining lower building. When the accident occurred, Owners immediately contacted their insurer, Newark, who advised that Owners immediately commence repairs. Owners then consulted Roussell, who gave Owners an estimate which included modification and improvement of the original wall design which, in Rousell's opinion, would strengthen the rebuilt wall. Roussell's suggestions were approved by Owners and Newark, and the wall was rebuilt by Reo for the sum of $5,562.00, of which amount Newark paid Owners $5,462.00. Later Owners became concerned about the safety of the wall and engaged the engineering firm of E. E. Edwards & Associates to inspect the structure. The inspection disclosed that neither the east nor west wall was in compliance with the building code. Evans suggested certain curative work to both end walls, and a contract therefor was let to Bedford Corporation for the sum of $2,602.00, after securing competitive bids therefor.
Mut filed suit against Owners and Newark to recover the cost of repairing his wall. Mut's petition, as amended, alleges that Owners are strictly liable for Mut's *242 damages which resulted from the collapse of Owners' wall on March 25, 1971; that the wall was part of a building constructed for Owners by Contractor pursuant to a contract dated on or about November 18, 1968, and that a proximate cause of the accident was the negligence of Contractor and Reo in: (1) Negligently constructing the wall; (2) improperly and negligently supervising construction; (3) failing to meet local building code requirements, and (4) negligently tieing the wall to the superstructure. Defendants answered Mut's petition denying liability, asserting a reconventional demand against Mut on the ground that Mut negligently allowed water from his roof to drip onto Owners' wall which weakened the wall and caused its collapse. Defendants also third partied Contractor, Reo and Maluski. Mut later amended his petition to include Contractor and Reo as defendants in the main demand. Contractor third partied Reo pursuant to Reo's indemnity agreement, and also third partied Phoenix and Travelers contending each insurer provided coverage of the loss. Reo third partied Lavergne based on Lavergne's agreement of indemnity. Phoenix and Travelers third partied Reo claiming indemnification rights.
Newark and Owners sued Reo, Contractor and Maluski. Newark claimed $5,462.00 through subrogation rights from Owners. Owners claimed $2,702.00, comprised of $100.00 deductible from Newark's policy and $2,602.00 paid Bedford for curative work done on the east and west walls of Owners' building following Reo's repair of the fallen east wall. Owners' petition alleges a contract with Contractor dated November 18, 1968, to construct subject building, and the collapse of the east wall thereof on March 25, 1971, due to the alleged negligence of Contractor and Reo. It was alleged that said negligence consisted of: (1) Failing to construct the building in accordance with the plans and specifications; (2) failing to meet the local building code; (3) improper and insufficient supervision; (4) failure to properly tie the end walls to the steel structure, and (5) certifying through Maluski that the building was finally inspected and met all requirements whereas no such inspection was made, and the building did not in fact comply with contract and building code requirements. Contractor third partied Phoenix, Travelers and Reo. Reo third partied Levergne. Phoenix and Travelers third partied Reo.
Maluski was dismissed from the Mut action because of faulty service of process, and Reo was dismissed therefrom as regards Newark's third party demand.
The trial court rendered judgment in favor of Mut against Owners, Newark and Contractor, in solido, in the sum of $9,059.32, finding Owners and Newark strictly liable pursuant to LSA-C.C. art. 667. Contractor's liability was founded on Maluski's failure to supervise and inspect the work, and certifying as to a final inspection which Maluski did not in fact make. In so holding, the trial court rejected Maluski's testimony in its entirety. Owners and Newark were awarded judgment against Contractor for the sum awarded Mut in accord with Contractor's indemnity agreement. Contractor's third party claims against Reo and Lavergne were rejected on the ground that neither Reo nor Lavergne were shown to have been at fault. Owners were also awarded judgment against Contractor in the sum of $1,401.00, representing $100.00 deducted from Owners' loss by Newark, and $1,301.00, as the cost of curing the west wall of Owners' building, which latter amount was one-half the sum paid Bedford to bring both end walls up to code requirements. Reo was cast in judgment to Owners in the sum of $1,301.00, calculated as the cost of curative work on the east wall. Newark was granted judgment against Contractor for the $5,462.00 paid Owner for the damages to Owners' building. Owners' demands against Phoenix and Travelers claiming coverage of the damage to both Owners' and Mut's buildings, and also claiming attorney's fees for failure to defend these actions, were denied.
*243 All remaining demands were rejected. Contractor was held liable for all costs. Lavergne excepted, all parties have appealed some aspect of the trial court's judgments.
Plaintiff Mut appealed devolutively from the judgment dismissing his action against Reo on the ground that Reo should have been found at fault in negligently selecting and installing the wall ties, which negligence caused the wall to collapse.
Owners and Newark have appealed suspensively from the judgment holding them liable to Mut, contending the trial court erred in applying LSA-C.C. art. 667 to the facts of this case because Owners have not been shown to have been negligent in this instance.
Contractor has suspensively appealed the judgments in both cases. In the Mut case, Contractor claims the trial court erred in: (1) Discounting Maluski's testimony in its entirety; (2) Finding that Maluski breached the degree of skill owed by a supervising engineer notwithstanding the failure of the record to include evidence of the standard of care prevailing among engineers in the community; (3) Awarding Mut recovery despite Mut's failure to prove any breach of duty by Contractor or any other party sought to be held liable herein; (4) Rejecting Contractor's indemnity claim against Reo; (5) Failing to hold that Phoenix's and Travelers' policies provided coverage for Mut's claim; (6) Holding that Phoenix and Travelers were not obligated to defend Mut's claim, and (7) Declining to award Contractor Attorney's fees against its insurers because of insurers' failure to defend both actions. In the Newark case, Contractor maintains the trial court erred in allowing Owners and Newark recovery of the cost of repairing the wall and allowing Owners to recover the cost of curative work because the record fails to establish proof of loss, and also fails to establish Newark's right to subrogation. Contractor also maintains the lower court erred in discounting Maluski's testimony. In addition, it is contended the lower court erred in finding that plaintiffs had established the degree of skill required by an engineer in the community, and that Maluski breached a duty of care owed plaintiffs. Contractor alleges further error in the trial court's rejection of its indemnity claim against Reo. Finally, Contractor urges the trial court erred in holding that Phoenix's policy did not cover Owners' loss, and also in holding that Phoenix was not obligated to defend Contractor against the claims of Newark and Owners.
Reo has appealed the judgment against it in favor of Owners for $1,301.00, and also contends that if judgment is maintained against it on appeal, Reo should have judgment against Lavergne on Lavergne's indemnity agreement.
Phoenix and Travelers have appealed devolutively claiming recovery against Reo in the event coverage be found under either policy.

MUT'S CLAIM AGAINST OWNERS AND NEWARK UNDER LSA-C.C. ART. 667.
LSA-C.C. art. 667 provides as follows:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
The trial court found that Article 667, as interpreted by Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375, and Chaney v. Travelers Insurance Company, 259 La. 1, 249 So.2d 181, imposes strict liability in tort upon a landowner for damages resulting to a neighbor from works erected or maintained upon the landowner's property. Owners and Newark contend that Article 667 does not apply to damages caused by structures on one's land, but only to activities conducted thereon by an owner. They argue that since the record contains no proof of any negligent act by Owners in this instance, Article 667 is inapplicable and Owners are not *244 liable to Mut. We find this position directly opposed to the present interpretation of Art. 667, above, as developed by the Supreme Court through the holdings in Reymond and Chaney, above. Reymond, above, limited the scope of Article 667, above, to damages caused by a building or structure, and held the Article inapplicable to an action for damages resulting from an owner's wrongful conduct or actions on the ground that such actions imposed liability under the general tort law. Reymond, above, further held that, as this article was a law of property and therefore not applicable to the actions of man, the damages must have been due to the very existence of the structure. As stated in Reymond, above:
"Thus Article 667 prohibits a proprietor of an estate from constructing and keeping buildings, edifices, structures, levees, and other such works upon his estate which do damage to a neighbor or deprive the neighbor of the facility of enjoying his own estate. The article is applicable only to structural changes in or on the land, and it is the existence of the thing, the construction, or the change upon the estate which must give rise to the damage."
However, Chaney expressly overruled Reymond insofar as the former decision held Article 667 inapplicable to activities conducted by an owner on his land. In so doing, the Court cited and adopted the following reasoning of Professor Yiannopoulos as concerns the interpretation to be given to Article 667:
"`While the literal interpretation of Article 667 in the light of its historical sources might leave room for the view that the word "work" means merely "constructions," a teleological interpretation of the same article leads to the conclusion that the word "work" ought to include "acts." In other words, as a matter of policy, it is preferable to apply article 667 to all situations in which constructions or activities cause unwarranted harm to property. The contrary view would not only unsettle Louisiana jurisprudence and would write out of the Code the sic utere doctrine, but it would eliminate a most important legislative basis for civil responsibility and result in unnecessary importation of a common law tort doctrine.'" (Emphasis by the Court.)
We interpret Chaney to hold that the strict liability imposed by Article 667 is not limited to instances where the mere existence of a work, structure or building on a landowner's premises causes unwarranted damage to neighboring property. In our view, Chaney extends Article 667 to all instances wherein an activity, work, structure or building on an owner's property causes unwarranted damage to neighboring property. In this regard, we note the following in Chaney:
"Article 667 is therefore a limitation the law imposes upon the rights of proprietors in the use of their property. It is a species of legal servitude in favor of neighboring property, an expression of the principle of sic utere. An activity, then, which causes damage to a neighbor's property obliges the actor to repair the damage, even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on which is significant; it is the fact that the activity causes damage to a neighbor which is relevant. This being ascertained, it remains only to calculate the damage which ensued." (Emphasis by the Court.)
We are of the opinion that the above quoted language also applies to damages occasioned by a structure on an owner's land. If the structure causes unwarranted damage, the landowner is liable. We can think of no damage more unwarranted than that caused by the collapse of a building onto a structure of an adjoining owner. We hold, therefore, that Owners and Newark are liable to Mut for the damage *245 caused Mut's property by the collapse of Owners' wall.
CONTRACTOR'S CLAIM OF COVERAGE OF MUT'S LOSS BY CONTRACTOR'S INSURERS, PHOENIX AND TRAVELERS.
Mut's claim against Contractor is in tort. Phoenix's policy includes coverage for both "Comprehensive General Liability" (liability in tort) and "Contractual Liability" (liability under contract). As regards coverage for general tort liability, Section 1 of the insuring clause of Phoenix's policy states:
"The company will pay on behalf of the insured all sums which the insured shall become obligated to pay because of * * * *
to which this insurance applies caused by an occurrence, and the company shall * * * *" (Emphasis by the Court.)
The policy defines "occurrence" as follows:
"`Occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;" (Emphasis by the Court.)
Phoenix cites and relies upon well established jurisprudence which holds that parties to an insurance contract are free to contract as they see fit provided the agreement be not contrary to good morals; that where policy language is clear and explicit the rule of strict construction applicable in insurance matters does not justify perversions of policy language or create ambiguity where none existed or impose obligations not intended by the parties; that an insurer may limit its liability, and that where the terms of an insurance contract are clear, the courts will enforce the agreement as written. Contractor invokes the rules of interpretation which hold that any ambiguity in an insurance agreement must be construed against the insurer; that the policy is ambiguous and therefore should be interpreted to include coverage of Mut's claim. Contractor also relies upon Kendrick v. Mason, 234 La. 271, 99 So.2d 108; Taylor Contracting & Supply Company v. American Mutual Liability Ins. Co., La. App., 163 So.2d 450, and Audubon Coin & Stamp Co. v. Alford Safe & Lock Co., La.App., 230 So.2d 278, which hold that where a policy insures against loss by accident, coverage is afforded where the accident occurs in the policy period even though the actual damage does not result until after expiration.
Phoenix successfully contended below that the authorities relied upon by Contractor are inapplicable because all said cases involved insurance against "accident", whereas subject policy insures against an "occurrence", which is clearly defined in the policy as an accident which results in bodily injury or damage while the policy is in force. Phoenix further contends that since 1966, all insurers have employed the term "occurrence" specifically to avoid the effect of the decisions cited by Contractor. As noted by Phoenix, subject policy is indeed different from those involved in the cited authorities. The coverage afforded in this instance must be determined in the light of the language employed in the policy.
Contractor argues that since the definition of "occurrence" is that "occurrence means an accident ....", the meaning of accident has not been changed; that occurrence is broader than accident, and should be so interpreted favorably to the insured, and that, since the qualifying words "during the policy period" are set off by commas, it was intended that coverage would be afforded if the accident happened in the policy period, and not that the loss was required to be sustained while the policy was in effect.
As did the trial court, we find Phoenix's position well taken. As to tort liability, the policy insures Contractor against liability *246 for an occurrence which is expressly defined in clear, explicit and unambiguous terms. Phoenix did not insure against loss by "accident", but rather against an "occurrence", which is defined as an accident which produces loss or injury during the policy period. We find nothing ambiguous in the language used. We note that a similar interpretation was given an identical policy provision of Oceanonics, Inc. v. Petroleum Distributing Co., La.App., 280 So. 2d 874. Admittedly, Oceanonics, above, concerned a "completed operations" coverage clause, as noted in our hereinafter more detailed consideration of that case in disposing of Contractor's claim of coverage under Travelers' policy. We find that Phoenix's policy did not cover Mut's claim because Mut's damage did not occur within the policy period.
Contractor argues that if Phoenix's policy does not cover Mut's loss, Travelers' policy does. The provisions of both policies are identical as to general tort liability coverage. Contractor maintains that if Phoenix's policy is inapplicable, Travelers' policy affords coverage because the loss was sustained while Travelers' policy was in force. Travelers concedes its policy would be applicable but for its express exclusion of coverage of completed operations hazard, which is defined in the policy as follows:
"`completed operations hazard' includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. `Operations' include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following time:"
The exclusionary clause relied upon by Travelers reads as follows:

"EXCLUSION

Completed Operations Hazard and Products Hazard)
It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage does not apply to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard."
Relying upon Cooling v. United States Fidelity and Guaranty Co., La.App., 269 So.2d 294, Contractor argues that Travelers' attempted exclusion of completed operations hazard coverage is ineffective in this instance. Cooling, above, involved a suit for attorney's fees based on the insurer's refusal to defend an action against the insured, a vendor of diesel engines. The insured sold an engine to one Fruge knowing the device would be used in an oil field operation. The insured also knew a flame arrester was required to render such use safe, but failed to so warn the purchaser. Asserting a completed operations hazard exclusion, the insurer declined to defend. Cooling held that the fault of the insured (failure to warn a customer of a known potentially dangerous use of a product) did not fall within the ambit of completed operations hazard and coverage therefor was not precluded by an exclusion of such risks. The court held that the fault involved did not consist in selling a defective product or negligence of manufacture, but rather constituted negligence categorized as a general business risk which was the type of coverage intended to be purchased and provided under the insured's comprehensive liability coverage.
We agree that Cooling is distinguishable in that it consisted of a failure to warn of a known danger, and did not concern a completed operations hazard. Additionally, we note that Cooling dealt with the insurer's duty to defend, which is broader than coverage.
The instant matter is analogous to Franks v. Guillotte, La.App., 248 So.2d *247 626, wherein a truck owner sued a garage for damages allegedly resulting from defective repair work. The insurer moved for and was granted summary judgment dismissing the claim as to the insurer on the ground there was no coverage because the loss occurred after the repair work was completed, and the insured's policy excluded coverage of completed operations hazard.
We also note Meier v. Hardware Mutual Casualty Company, La.App., 281 So.2d 793, in which defendant-insured constructed a gin pole for plaintiff. The pole collapsed and plaintiff sued for damages. Insurer was granted summary judgment dismissing the action on the basis of a completed operations hazard exclusion identical to that contained in Travelers' policy. Meier pointed out the factual distinction between Cooling and Meier by noting that in Cooling there was no defect in the engine sold nor was faulty workmanship alleged with regard to the operation involved. In Meier the defect existed in a product completed and sold, namely, an erected gin pole. Since the operation was completed when the damage occurred, the exclusion of completed operations hazard was held to eliminate coverage of the incident.
On authority of Kendrick v. Mason, 234 La. 271, 99 So.2d 108, Contractor argues that Travelers' attempted exclusion of completed operations hazard is ambiguous, consequently, such attempted exclusion should be denied. We find Kendrick, above, distinguishable on its facts. The cited authority declined to enforce a completed operations hazard exclusion where a definition of such risks was included in a policy section pertaining to products hazard. The court found that ambiguity resulted from this circumstance. The court also found that since the products liability exclusion was limited to manufacturers, the limitation could not be extended to an insured who did not produce anything. Travelers contends the holding in Kendrick resulted in a policy revision which disassociates products hazard coverage from completed operations hazard definition and coverage, as Travelers' policy does in this instance. We agree there is no similarity between Travelers' policy and the policy involved in Kendrick. We find no ambiguity herein to justify application of the rule in Kendrick.
Contractor cites Oceanonics, Inc. v. Petroleum Distributing Company, La.App., 280 So.2d 874, as holding that a completed operations hazard definition identical to that involved in Travelers' policy is limited in scope to materials, parts and equipment. Therefore, according to Contractor, the exclusion applied only to claims arising from defective materials, parts and equipment, and has no application in this instance because Mut's claim is based on alleged failure to supervise and improper design. We find nothing in Oceanonics to support this contention. Oceanonics involved a claim against the insured, Taylor's Welding Service, Inc. (Taylor) for damages resulting from the alleged negligent welding of a dragline boom. At the time the work was performed, Taylor was insured by Market Insurance Company (Market) pursuant to a policy which afforded general liability coverage including completed operations hazard. The damage occurred, however, after Taylor's policy expired and while a policy issued by All-Star Insurance Corporation (All-Star) was in force. Market's policy insured Taylor against "occurrences". All-Star's policy excluded coverage of completed operations hazard as does Travelers' policy in this case. Oceanonics held that the circumstances constituted a completed operation in that the damages occurred after the work was complete and away from premises owned or leased by the insured. The court held, however, that Market afforded no coverage for the completed operation incident because Market's policy insured only an occurrence, that is, an incident which produced damages while Market's policy was in force. The court also held that All-Star's policy afforded no protection to the insured because All-Star's policy excluded completed operations hazard.
*248 Oceanonics distinguishes Cooling on the ground that Cooling involved the sale of a product and the failure to warn of a danger incident to its known intended use, whereas, Oceanonics dealt with a completed service which was allegedly improperly and defectively performed. Oceanonics also pointed out that it involved alleged fault workmanship and a representation made with regard thereto which produced damage after the project was completed. The same distinction exists in this instance. In effect Oceanonics held that failure to warn of defective workmanship falls within the ambit of completed operations hazard where damage from such failure results after the work is completed. We agree. We find no merit in Contractor's argument that completed operations hazard extends only to damages resulting from defective materials, parts and equipment. Such an interpretation would, in our view, lead to the patently absurd result of excluding coverage of liability for faulty workmanship or design where completed operations hazard coverage is afforded.
CONTRACTOR'S CLAIM OF COVERAGE OF OWNERS' LOSS BY PHOENIX AND TRAVELERS.
This argument is based on the following provision contained in Phoenix's policy:
"The company will pay on behalf of the insured all sums which the insured, by reason of contractual liability assumed by him under any written contract of the type designated in the schedule for this insurance, shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit...." (Emphasis by the Court.)
A substantially similar provision is contained in Travelers' policy.
Phoenix contends there is no contractual liability coverage on its part because there was no occurrence within its policy period. We think this position well taken.
Additionally, Phoenix and Travelers maintain there is no coverage of contractual liability by either insurer because the policies contain the following definition of contractual liability:
"Contractual liability" means liability expressly assumed under a written contract or agreement; provided, however, that contractual liability shall not be construed as including liability under a warranty of the fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner. (Emphasis by the Court.)
Under the foregoing definition of contractual liability, we find no coverage on the part of either insurer. Contractual liability is clearly defined as liability expressly assumed under a written contract and specifically excludes liability under a warranty of fitness or quality of work performed by or on behalf of the insured. In this instance, Owners seek recovery for alleged breach of Contractor's obligation of warranty of the finished work. Finally, we note that Contractor does not allude to any provision in his contract with Owners whereby Contractor expressly assumed in writing an obligation sought to be enforced by Owners. We conclude the trial court properly held that neither Phoenix nor Travelers provided coverage of Owners' claim.
CONTRACTOR'S CLAIM FOR ATTORNEY'S FEES FOR FAILURE OF ITS INSURERS TO DEFEND.
Contractor urges that assuming there was no coverage by either Phoenix or Travelers, either or both of said insurers were obligated to defend the action by Mut against Contractor, and Phoenix was obligated to defend the suit against Contractor *249 by Owner. In so arguing, Contractor relies upon the rule that the action to defend is broader than coverage. Again, Contractor relies heavily upon Cooling, above.
It is well settled that an insurer's duty to defend its insured is broader than coverage. It is also well established that the duty to defend depends upon the allegations of plaintiff's petition, and that the insurer must defend unless the allegations unambiguously exclude coverage. The applicable test in such instances is if, assuming plaintiff's allegations to be true, there is both coverage under the policy and liability to plaintiff, the insurer is obliged to defend regardless of the outcome of the litigation. American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253; Spiers v. Lane, La.App., 279 So.2d 549.
We find there was no duty on either Phoenix or Travelers to defend either Mut's or Owners' actions against Contractor. As hereinabove summarized, the allegations of Mut's petition unambiguously show there is no coverage of Mut's claim against Phoenix. The averments do not relate the happening of an occurrence within the policy period, but rather that the building collapsed after its completion. As to Travelers, there is clearly no coverage of Mut's claim because Mut's petition unambiguously alleges the collapse of a completed building and Travelers' policy excludes such coverage in equally unambiguous terms. Accepting the allegations as true, Mut has not asserted a claim covered by either policy.
Owners' petition clearly charges Contractor with negligence in performing the work and breach of contractual warranty of workmanship. Coverage of such liability is expressly excluded by both policies pursuant to the definition of contractual liability contained in each policy as hereinabove set forth. As noted, contractual liability is defined as liability expressly assumed in writing and specifically excludes liability based on the insured's warranty that work performed by the insured will be done in a workmanlike manner.
We find the trial court correctly rejected Contractor's claim for attorney's fees on the ground that neither Phoenix nor Travelers were obligated to defend Contractor in these consolidated actions.

NEWARK'S ALLEGED FAILURE TO PROVE SUBROGATION
Newark claims entitlement to subrogation to the sum of $5,462.00 paid Owner by virtue of the following instrument:
 "LOAN RECEIPT
 LOSS NUMBER N 448 R 00121
 DATED: September 7, 1971
 $5,462.00 (+$100 deductible $5,562.00)
 (sic)
RECEIVED FROM Royal-Globe Insurance Companies INSURANCE COMPANY the sum of Five Thousand, 4 hundred sixty-two and 00/100 Dollars, as a loan, without interest, under policy No. NYN 15 12 36, repayable only in the event and to the extent that any net recovery is made by them from any person or persons, corporation or corporations or other parties, on account of loss by fire, sprinkler leakage, or other casualty for which this company may be liable occasioned to their property on or about 25th day of March, 1971.
As security for such repayment, we hereby pledge to said Royal-Globe
INSURANCE COMPANY whatever recovery they may make, and deliver to it herewith all documents necessary to show our interest in said property and we hereby agree to promptly present claim and, if necessary, to commence, enter into and prosecute suit against such person or persons, corporation or corporations, through whose negligence the aforesaid loss was caused or who may otherwise be responsible therefor, with all due diligence, in our own name, but at the expense of/and under the exclusive *250 direction and control of the said Royal Globe INSURANCE COMPANY.
 Louis Selig, Jr."
Newark also relies upon the following provision contained in its policy:
"E. SUBROGATION: In the event of any payment under this policy, the Company shall be subrogated to all the insured's right of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."
Based on the foregoing, Newark contends conventional subrogation took place in its favor pursuant to LSA-C.C. art. 2160(1), which states:
"1. When the creditor, receiving his payment from a third person, subrogates him in his rights, actions, privileges, and mortgages against the debtor; this subrogation must be expressed and made at the same time as the payment."
Contractor maintains there can be no conventional subrogation in this instance because there has been no proof of payment, that is, the instrument relied upon by Newark is not a receipt for payment of money to Owners but a note evidencing a loan by Newark to its insured. On authority of Zurich Insurance Company v. Williams, La.App., 216 So.2d 602, and authorities therein cited, Contractor maintains the agreement signed by Owner does not indicate intent to subrogate Owners' claims to Newark, consequently conventional subrogation did not result therefrom.
Our jurisprudence has interpreted Article 2160(1), above, to mean that where a creditor receives payment of a debt from a third party, a subrogation agreement relative thereto may either precede or take place simultaneously with the payment, but may not take place thereafter. Cooper v. Jennings Refining Company, 118 La. 181, 42 So. 766.
We find Zurich Insurance Company, above, inapplicable herein. Zurich involved a subrogation claim pursuant to an alleged Trust agreement which contained no mention of subrogation. The insurer suing thereon did not introduce in evidence a policy containing a subrogation clause as did Newark in this instance. The court in Zurich, above, properly held that the Trust agreement, standing alone, did not establish the right to subrogation.
In this instance, Newark's policy expressly provides for subrogation in the event of insurer's payment of a claim to Owners. The question in this instance is whether the Loan Receipt executed by the insured constitutes evidence of payment. Viewing the instrument in its entirety, we conclude it is, in effect, a receipt for payment of damages sustained by Owners and covered by Newark's policy. Although the word loan appears in the instrument, it is clear that Owners are not bound or obligated to repay the amount received, and that insurer's recovery is relegated to a claim against the person or persons responsible for Owners' loss. Construed in conjunction with the policy provision requiring subrogation in the event of payment, we conclude the so-called Loan Receipt effected conventional subrogation in this instance.
CONTRACTOR'S CLAIM THAT PLAINTIFFS FAILED TO PROVE THE CAUSE OF THE WALL'S COLLAPSE.
Plans for the building called for a Dur-O-Wal (strengthening course) every third course of end wall blocks. The walls were also to be tied to the steel columns with bolts every fifth course. In addition, U block courses were to be employed at the ten and twenty foot levels and filled with concrete to provide further wall strength. It is conceded that these plans met local building code requirements, and, if so constructed, *251 could withstand a wind pressure of 25 pounds per square foot, the equivalent of an 85 mile per hour wind. The code required a wall capable of withstanding a pressure of 15 pounds per square foot or winds of 75 miles per hour.
Maluski explained that the end walls were too high to be self supporting and had to be tied to the building frame for lateral support. He also noted that both the steel structure and the walls themselves would have a tendency to move. He stated that steel framing expands and contracts with heat and cold causing movement of the superstructure. He also observed that the end walls also would move with temperature changes, and, in addition, were subject to movement and stress by exterior wind forces pushing inward (compression) and interior wind factors pushing outward (tension). In addition, he knew that use of the overhead crane would cause vibrations to the superstructure and supporting columns. For these reasons, he prescribed the use of U bolts to provide additional lateral support and informed Roussell that a ¾ inch space should be left between the inner surfaces of the walls and the supporting building columns so that vibrations from the columns would not be transmitted to the walls. During the construction, Maluski informed Roussell that Roussell might have trouble inserting the U bolts at the required heights on the columns to fit into the block cores at proper course levels as called for by the plans because it was impossible to tell exactly where each course would lie as the wall went up. Maluski suggested that Roussell double nut the bolts to allow for some flexibility so that after being bolted to the columns, the bolts could be inserted into the correct course cores of the wall. Roussell agreed that proper spacing of the bolts would constitute a problem and suggested the alternative of using flexible wall ties which would be welded to the columns and inserted into the mortar joints of the walls at designated intervals. Maluski then consulted several design authorities and concluded that 22 gauge flexible, metallic wall ties, measuring at least ¾ inch wide and 7 inches long would provide the same amount of lateral wall support as the U bolts designated on Maluski's plans. Maluski so informed Roussell who employed wall ties instead of bolts. He also informed Roussell to change the Dur-O-Wal courses from every second to every third course, and to put the wall ties in at every 16 inches on the columns or every second course of wall blocks. Maluski explained that the ties were to be welded to the columns and because of the thinness of the metal used, great care was required in making the welds, especially since he required two ties, one on each side of the supporting I beams, every sixteen inches. Maluski conceded that he did not personally inspect the welds. He did not call for either the second or third and final inspection required by the building code. He further admitted that to obtain an occupancy permit for Standard, he attested to local authorities that the building had been completed in accordance with approved contract plans and specifications. Maluski conceded he had never before used or approved flexible wall ties in construction of a wall on a commercial building of this nature.
Joseph L. Guarisco, Chief City Building Inspector, testified the plans as filed met building code requirements, but the building as constructed with flexible wall ties did not. Although he did not mathematically compute the strength of flexible wall ties, he deemed those used to be inadequate and attributed the failure of the wall to the fact that the completed building did not meet code requirements. He examined the building after the accident and found that some of the ties were not properly welded. Guarisco made the required first inspection during construction. No further inspections were made because none were requested by the contractor. He stated that had a second inspection been requested, it would have included a check of the wall ties. He affirmed that Maluski filed a certificate stating that Maluski's final inspection of the building showed the *252 structure was completed in accordance with the plans and specifications whereas it had not.
E. W. Wardlaw, Engineer, employed by Edward E. Evans & Associates, Consulting Engineers, checked the west wall of Owners' building at Owners' request, after repairs had been made to the east wall by Reo following the accident. Wardlaw was engaged to recommend measures to Owners for making the wall safe. In his professional opinion, based on examination of the west wall which remained intact, the walls, as originally built, would not withstand required wind pressures. In essence, he stated the walls were entirely too high to be supported by flexible wall ties of the nature employed assuming the walls were otherwise built according to the plans. He conceded that he did not scientifically compute the supportive capacity of the ties used, but was steadfast in the opinion that the ties employed were insufficient. Wardlaw also attested to the type of curative work he recommended be done on both end walls.
The record contains considerable testimony concerning the manner in which the ties were welded to the columns. To say the least, the evidence on this score is conflicting on the issues of whether there were sufficient ties, and whether they were properly welded or welded at all in some instances. In view of the conclusion hereinafter reached, no useful purpose would be served by detailing this testimony.
In effect, the trial court found that the wall collapsed because of Maluski's faulty design, that is, approving the use of wall ties which did not meet building code requirements, and which were inadequate to support the load of the walls in question. A disinterested inspector and a fully qualified engineering expert testified unequivocally that the ties employed did not meet code requirements and were insufficient on this particular job. Admittedly, these witnesses so testified without having made mathematical computations on the ties used. However, the trial court rejected Maluski's testimony as being selfserving, and also on the ground he did not believe Maluski because of Maluski's certification of facts which were not true. Obviously, the trial court found a vast difference between the support afforded by U bolts inserted into block cores and flexible wall ties merely inserted into mortar joints. We find no error in these conclusions; most certainly, we find no manifest error.
In essence, Contractor contends the trial court improperly entered objections to Maluski's testimony, whereas, no such objections were made by opposing litigants. The record does not support this contention. In rejecting Maluski's testimony for the reasons indicated, we find the trial court merely exercised its prerogative to determine witness credibility. It is elementary that it is the duty of a trial court to weigh and determine the credibility of each witness and accept or reject the testimony of a witness accordingly as the court is impressed with the witness's testimony and demeanor.
We find no merit in Contractor's contention that the ties must have been adequate because the west wall did not collapse. It would have been most extraordinarily coincidental had both walls of the building simultaneously collapsed. Since both end walls were reinforced after the collapsed east wall was rebuilt, it is now impossible to determine whether the west wall would not have also eventually fallen had it not been reinforced in accord with Wardlaw's design.
We also find no basis for Contractor's claim that Contractor should be exonerated for lack of proof of Maluski's alleged negligence, lack of skill, and failure to exercise the degree of skill and care customarily exercised by engineers in the locality. In this connection, we note Wardlaw's professional opinion that the wall ties did not meet code specifications, and would have been inadequate even if properly welded and inserted into the mortar *253 joints. The trial court noted that it was most unskillful and unprofessional of Maluski to certify the building had been completed in accordance with filed and approved plans and specifications when, in truth, he knew it had not. We concur in the trial court's observation that if it is common practice in the engineering and construction field to certify falsely, the courts would not sanction a practice based on deceit and misrepresentation as ground for relieving one of liability because such was an industry wide usage. We have no difficulty in concluding, as did the trial court, that Maluski's negligence and want of skill is established herein, and that such negligence and his failure to supervise the work was the cause of Owners' damage.

CONTRACTOR'S CLAIM FOR INDEMNITY FROM REO
The trial court found no proof of negligence, failure of contractual duty or want of skill on Reo's part in constructing the wall. Contractor contends the change was made at Reo's suggestion, therefore, Reo should shoulder the responsibility if the ties used were inadequate. Contractor also inferentially maintains that if the ties were not properly welded, or if some ties were not welded at all, this was also Reo's responsibility. We point out that responsibility of design rested entirely upon Contractor. If Reo suggested an alternative method of bracing the walls, it was Contractor's duty to determine the feasibility thereof, and whether or not the change would result in a safe building. Contractor failed in the exercise of this obligation by approving an unsafe design. Under the circumstances, we find that Reo had the right to rely upon Contractor's approval of the recommended substitution. Concerning alleged defective welds, or failure to weld ties, the trial court found that Contractor failed to establish any fault or negligence on Reo's part. In view of the mass of conflicting evidence on this score, we cannot say the trial court erred in this respect.

CLAIMS AGAINST LAVERGNE
Lavergne's contract called merely for furnishing the labor to lay the block walls, insert the wall ties into the mortar joints and leave the other tie ends free to be welded to the steel columns after the wall was completed. The record is barren of testimony that Lavergne failed in any way to perform as required. We find no basis for holding Lavergne liable to any party herein.

CONTRACTOR'S CLAIM OF LACK OF PROOF OF DAMAGES BY MUT AND OWNERS.
As to Mut's claim, the record establishes clear proof of the various elements constituting said plaintiff's claim for the sum of $9,059.32. In support thereof, Mut introduced various detailed cost estimates for repairing the roof, wall and supporting columns of his damaged building. These itemized estimates are unchallenged and constitute sufficient proof.
While we do not presently determine liability therefor, we note that Owners have introduced in evidence a detailed statement from Bedford itemizing the cost of the work proposed by Wardlaw to make both walls safe, following Reo's repair of the fallen east wall. Under the jurisprudence, this suffices as proof of these damages.
We find, however, that Owners have failed to establish with that degree of certainty required by law, the cost of the initial repairs made to the east wall by Reo. The only proof of the amount required to rebuild the fallen east wall consists of Selig's testimony that Reo reconstructed the wall for $5,562.00. Plaintiff must establish his loss by a preponderance of evidence. Pierrotti v. St. Paul Fire & Marine Insurance Company, La.App., 273 So.2d 363. Where invoices, statements or records of amounts expended for repairs are available, such records constitute the best evidence, and should be produced in proof of plaintiff's claim. In the absence *254 of such records, the testimony of the person or persons making the repairs may be offered as proof. If neither is shown to be available, courts may allow recovery upon the offer of such evidence as fairly and reasonably substantiates plaintiff's claim of payment. Tooker v. Zuberbier, La.App., 105 So.2d 744; Lambert v. Allstate Insurance Company, La.App., 195 So.2d 698. Owners have not shown the unavailability of invoices, statements or the testimony of the parties who performed the repairs. We therefore remand this matter to the trial court for the introduction of proof of Owners' alleged payment of $5,562.00 to Reo for repairs to the fallen east wall of Owners' building.
REO'S AND CONTRACTOR'S CLAIM OF ERROR IN ASSESSING EACH FOR THE SUM OF $1,301.00 AS THE COST OF IMPROVING THE WALLS OF OWNERS' BUILDING.
In substance, Reo contends it is not an engineer or architect, but merely a contractor, and that it entered into a verbal agreement with Owners merely to rebuild a better wall for Owners, which Reo did. In effect, Reo maintains it did not undertake to reconstruct a wall which would meet code requirements, but only to construct an improved wall. The agreement was negotiated on behalf of Owners by Selig who testified he made it clear to Roussell that Owners wanted a safe wall, one which would not collapse in view of what had happened, even if it meant Owners spending more money. Selig also testified he left the matter to Roussell's judgment and entirely in Roussell's hands. The trial court accepted Selig's testimony that Reo agreed to rebuild a safe and sound wall. Reo points to Guarisco's testimony to the effect that on July 2, 1971, Guarisco inspected the rebuilt wall and found it in compliance with the code. However, Wardlaw testified that his inspection of the wall after it had been rebuilt by Reo disclosed, that the wall did not meet code specifications because it was not braced against the columns. In view of the conflicting evidence on this issue, we are unprepared to say the trial court manifestly erred in finding that the wall, as reconstructed by Reo, needed further bracing to render it safe. We affirm the judgment casting Reo to Owners in the sum of $1,301.00 for rectifying the defects in the repaired east wall.
Contractor's claim that it was erroneously cast for $1,301.00 in favor of Owners representing the cost of repairing Owners' west wall is without merit. It was Contractor's obligation to construct an edifice which was safe, and which also met building code requirements and contract plans and specifications. The wall as built did not discharge Contractor's obligations in these respects. Again, we note Wardlaw's expert testimony that because of its height, the west wall required further bracing to make it sound and meet code requirements. It was Contractor's obligation to have so constructed the wall in the first place. The trial court properly cast Contractor for this item.
OWNERS' RECONVENTIONAL DEMAND AGAINST MUT BASED ON CLAIM THAT DRIP FROM MUT'S ROOF CAUSED THE COLLAPSE OF OWNERS' WALL.
The basis for this claim is the contention that the entire east wall of Owners' building collapsed at about nine feet above foundation level, the approximate height of the eave of Mut's building. There is considerable testimony of record concerning whether the drip from Mut's eave fell straight down or whether in a hard rain, it would strike the wall of Owners' building. It also appears that some sections of the wall collapsed at or about the level of the eaves on Mut's building whereas other sections collapsed above that point. Maluski did not attribute the collapse to a weakening of the wall by a drip from Mut's roof; he repeatedly stated he could not tell what caused the failure. *255 Wardlaw, as noted above, attributed the failure to the fact that the wall had insufficient lateral support for its height. In view of this and other testimony in the record, we concur in the trial court's finding that the drip from Mut's building did not contribute in any way to the collapse of Owners' wall.

MUT'S APPEAL OF REJECTION OF HIS CLAIM AGAINST REO.
For the reasons set forth in disposing of Contractor's claim against Reo, we find Reo without fault and affirm the judgment denying Mut's claim against Reo.

JUDGMENT IN NUMBER 9618
It is ordered, adjudged and decreed that the judgment rendered in the suit entitled "MELVIN E. MUT Vs. NEWARK INSURANCE COMPANY, ET AL., Number 9618 on the docket of this court, in favor of Plaintiff Mut against Defendants, Louis Selig, Jr., William H. McDougall, Newark Insurance Company and Steel Builders, Inc., for the sum of NINE THOUSAND FIFTY-NINE and 32/100 ($9,059.32) DOLLARS, and rejecting all other demands therein, be and the same is hereby affirmed at the cost of Appellant, Steel Builders, Inc.
Affirmed.

JUDGMENT IN NUMBER 9619
For the reasons set forth above,
It is ordered, adjudged and decreed that the judgment rendered herein is affirmed, excepting the award in favor of Newark Insurance Company against Steel Buildings, Inc., in the sum of Five Thousand Four Hundred Sixty-Two and No/100 ($5,462.00) Dollars, and the award in favor of William H. McDougall and Louis Selig, Jr. against Steel Builders, Inc., in the sum of One Hundred and No/100 ($100.00) Dollars, in payment of damages to the wall of the building owned by McDougall and Selig, in which respects the judgment is hereby reversed and set aside.
It is further ordered, adjudged and decreed that this matter be and the same is hereby remanded to the trial court for the purpose of permitting Newark Insurance Company, William H. McDougall and Louis Selig, Jr. to produce proof of the extent of damages to the wall of the building owned by McDougall and Selig, and for the trial court to render judgment therein; all costs of these proceedings, including the cost of this appeal, to be paid by Steel Builders, Inc. All costs incurred on remand shall be paid by Newark, McDougall and Selig.
Affirmed in part, reversed in part and remanded.