| ¡WHIPPLE, Judge.
In this dispute arising from design and construction contracts, defendants/plaintiffs-in-reconvention, Redeeming Word of Life Church, Inc. (“Redeeming Word”) and Reverend David Diamond, appeal from the judgment of the trial court, which ordered Redeeming Word to pay plaintiff, Morton Buildings, Inc., all moneys due under the contracts and dismissed Redeeming Word’s reconventional demand, which was based on alleged breach of contract. For the following reasons, we reverse.
FACTS AND PROCEDURAL HISTORY
On July 9, 1994, Reverend Diamond, pastor of Redeeming Word, entered into a design contract with Morton Buildings, Inc. (“Morton Buildings”) on behalf of the church, whereby Morton Buildings was to supply plans and specifications for the construction of a gymnasium and educational building. Thereafter, on September 6, 1994, the parties entered into a construction contract, whereby Morton Buildings agreed to construct the building for a price of $184,906.00.
Bryan Smyda, a sales representative for Morton Buildings, handled all of the contract negotiations with Reverend Diamond, and he also oversaw execution of the contracts in question on behalf of Morton Buildings. Smyda was the only Morton Buildings employee with whom Reverend Diamond dealt. In the contract negotiations stage, Reverend Diamond first indicated to Smyda that he wanted Morton Buildings to assume all responsibility for the construction project. However, Redeeming Word was unable to afford such an all-encompassing project. Thus, after further discussion, the parties agreed that Morton Buildings would construct the building, but would not perform any interi- or finishes. Redeeming Word agreed that it would provide its own subcontractors to perform the interior work, such as electrical work, plumbing, flooring and painting. The | ¡¡specific obligations of the parties in this respect were delineated in the construction contract.
Although not specifically listed in the contract as a responsibility of Morton Buildings, Smyda, as representative for Morton Buildings, agreed that he would assume responsibility for submitting the plans to the state fire marshal’s office for approval and for obtaining the building permit from the City of Baton Rouge/Parish of East Baton Rouge (“City/Parish”). Thus, when Morton Buildings completed the plans, Smyda in fact submitted the plans to the state fire marshal’s office. He later received a letter from that office, listing changes in the plans that would be required to bring the plans into compliance with the State Fire Marshal’s Act. Because of the changes necessitated by the fire marshal’s office, Morton Buildings and Redeeming Word executed a change order, whereby the necessary changes would be included in the construction contract at an additional charge to Redeeming Word of $5,195.00. Thereafter, the plans were approved by the fire marshal.
Regarding the obtaining of the building permit, Carl Jeansonne, a professional engineer with Baton Rouge Land Surveying, was hired by Redeeming Word to prepare a proposed certificate of elevation to be submitted with the permit application.[1] The parties had contemplated constructing *8 the gymnasium at the same elevation as the church’s existing building on the property. However, when Jeansonne submitted his proposed certifícate of elevation to Smyda, Smyda became aware that there was a problem with the elevation. In the proposed elevation certificate, the elevation of the structure as reported by Jean-sonne to be [4necessary to comply with the building code was over two feet higher than the elevation initially contemplated by the parties.[2]
Although the construction contract specifically provided that site preparation was the responsibility of Morton Buildings, Smyda did not interpret this portion of the contract as obligating Morton Buildings to elevate the site by an additional two feet. Thus, when he related the problem with the elevation of the site to Reverend Diamond, he told Diamond that compliance with this elevation requirement would cost Redeeming Word $7,000.00 to $8,000.00 over the initial contract price for additional site preparation work. Reverend Diamond responded that this additional charge was not what the parties had agreed to and that Redeeming Word' did not have the money to pay this additional sum. Thus, Reverend Diamond indicated that he could not pay the additional charge.
Smyda then spoke with Jeansonne to determine if there was anything that could be done to remedy the situation to the mutual satisfaction of the parties. Jean-sonne told Smyda that the Parish had a variance procedure, whereby an individual could apply for a variance which, if granted, would allow the construction of a building at a lower elevation than the elevation required by the building code. Smyda, in turn, explained the procedure to Reverend Diamond, and he and Diamond agreed to apply for a variance requesting that they be allowed to construct the gymnasium at the lower elevation.
Smyda agreed that he would personally handle the procedure for applying for the variance for the construction project. In that regard, he obtained the application and filled it out. Smyda then submitted both the application for the building permit and the application for a variance in early October 1994. On | ¡November 2, 1994, the building permit was issued to Smyda, as the contact person listed on the permit application. Upon receipt of the building permit, Smyda assumed that the variance had been granted. Thus, Morton Buddings began construction of the gymnasium two or three days after issuance of the permit.
In January of 1995, when construction of the building was approximately 90% complete, the Department of Public Works for the City/Parish denied the application for flood variance for construction of the gymnasium. Inasmuch as the variance was not granted, the gymnasium, which was constructed at the lower elevation sought in the variance, ■ was not constructed in compliance with the building code. As such, Redeeming Word is unable to obtain a certificate of permanent occupancy until the building is brought into compliance with the code.[3]
Because the gymnasium could not be permanently occupied at the elevation at which it had been constructed and was thus totally useless to the church, Reverend Diamond, on behalf of Redeeming Word, took the position that the contract had not been completed. Thus, on behalf of Redeeming Word, he refused to make the final payment of $18,056.60 on the *9 construction contract. Redeeming Word also did not pay the final $2,000.00 installment due on the design services contract or the $5,195.00 due on the change order.
Subsequently, Morton Buildings filed suit against Redeeming Word, seeking payment on the contracts.[4] Redeeming Word reconvened against Morton Buildings, alleging breach of the construction contract and seeking return of the contract price and damages.
| ^Following a bench trial, the trial court found that construction of the building was substantially complete, thus entitling Morton Buildings to payment on the contracts. Additionally, with regard to the reconven-tional demand, the trial court concluded that while Morton Buildings had undertaken to help Redeeming Word secure the building permit and flood variance, Morton Buildings had no duty to guarantee that the variance would be granted. Thus, the trial court found that Redeeming Word had failed to prove a breach of a contractual obligation by Morton Buildings.
Based on these findings, the trial court awarded Morton Buildings the outstanding sums due on the contracts, totaling $25,-251.60, minus a credit to Redeeming Word in the amount of $4,924.00 for work not performed or not in compliance with code. Thus, the total amount awarded in the judgment to Morton Buildings against Redeeming Word was $20,327.60. The judgment also awarded Morton Buddings $5,000.00 in attorney’s fees.
From this judgment, Redeeming Word and Reverend Diamond appeal, averring that the trial court erred in: (1) failing to find that compliance with the building code by the builder was a material unstated term of the construction contract; (2) failing to find that the builder had breached the construction contract where the building permit authorized the builder only to construct the building in accordance with the rules and regulations of the Parish of East Baton Rouge, which the builder clearly did not do; (3) failing to credit Redeeming Word with the stipulated sum of $4,069.00 required to bring the building in compliance with the fire code; and (4) awarding $5,000.00 in attorney’s fees in the absence of any evidence on the issue.
_yVIORTON BUILDINGS’ OBLIGATIONS UNDER THE CONSTRUCTION CONTRACT
(Assignments of Error Nos. 1 & 2)
It is an established principle that laws which are existing at the time of execution of a contract form a part of that contract and are incorporated in it. These laws form a part of the contract as though expressly written therein. Velasquez v. Custom Built Homes, Inc., 246 So.2d 699, 700 (La.App. 4th Cir.1971). Thus, where a parish or city has in effect a building code, the provisions of that building code form a part of every construction contract executed in that city or parish. As such, the construction contract contemplates a building constructed in compliance with local building code requirements, as though expressly written into the contract. Velasquez v. Custom Built Homes, Inc., 246 So.2d at 700; see also Mut v. Newark Insurance Company, 289 So.2d 237, 240 (La.App. 1st Cir.1973), writs denied, 290 So.2d 910, 912 (La.1974).
In Velasquez, the Fourth Circuit Court of Appeal held that where there was no express provision in the contract specifying which party had the responsibility to comply with the building code, custom would prevail. Because the record established that the contractor customarily had the duty to comply with the building code, the contractor was held responsible for the cost of rectifying any noncompliance. Velasquez, 246 So.2d at 700-701.
*10 In Mut, where the contractor conceded that the contract contemplated that the building would comply with local building code requirements, this court held that it was the contractor’s obligation to construct a structure which met those requirements. Mut, 289 So.2d at 240, 254. Thus, the contractor was held responsible for the cost of repairing the structure and bringing it into compliance with the code. Mut, 289 So.2d at 254.
In the instant case, at the time the parties executed the construction contract, the City/Parish had in effect a Building Code, which provided for specific | selevations for buildings constructed in the flood zone in which this construction site was located. City of Baton Rouge/Parish of East Baton Rouge Code, § 8:852(5)(b) & (c). Thus, these elevation requirements formed a part of the construction contract as though expressly written therein. Velasquez, 246 So.2d at 700.
As in Velasquez, there is no express provision in the construction contract at issue herein specifying which party had the responsibility to comply with the building code. Moreover, the contract does not provide which party has the responsibility for applying for a variance to provide an exemption from the flood elevation requirements of the code. Nonetheless, we find that the facts of this case establish a subsequent oral agreement as to responsibility for securing the variance.
Once the parties became aware of the inherent problem with the elevation originally contemplated by them, which occurred prior to construction beginning, they entered into discussions as to how to remedy the problem. Reverend Diamond made his position clear that he did not believe that the additional charge proposed by Smyda was contemplated by their original contract and that Redeeming Word did not have additional funds to pay the additional charge. Moreover, Smyda testified unequivocally that Morton Buildings would not have gone forward with elevating the project site without receiving extra compensation if the additional site preparation work was necessitated. Thus, unless the parties were able to obtain a variance from the City/Parish for the flood elevation requirements, the parties knew the construction project would not go forward.
Regarding responsibility for applying for the variance, it is undisputed that Smy-da, on behalf of Morton Buildings, agreed to assume responsibility for the variance application process. Indeed, the trial court found as a fact that Morton Buildings undertook to help Redeeming Word secure the variance. Nonetheless, in finding no breach of contract by Morton Buildings, the trial court further found 19that by merely undertaking to help Redeeming Word secure the variance, Morton Buildings did not assume a duty to guarantee that the variance would be granted.
While we agree with the trial court that the obligation to handle the variance application does not necessarily constitute a guarantee that the variance will be granted, we cannot conclude that such a finding absolves Morton Buildings from responsibility herein. Rather, it is clear from the record that Morton Buildings agreed to handle the variance application, and it is also clear that if the variance was not granted, construction on the project was not to begin. Thus, by obligating itself to handle the variance application procedure, Morton Buildings assumed the duty, at a minimum, to ascertain the status of the variance application, ie., whether it had been granted or denied, prior to beginning construction which was not in compliance with the code. The question then is whether Morton Buildings fulfilled this duty.
The trial court concluded that because it is the custom in the trade that once a building permit has been secured, the contractor has authority to build, there could be no finding that Morton Buildings had breached “some unwritten and extra duty” to secure the variance. Again, we agree with the trial court that Morton Buildings *11 did not have a duty to actually secure the variance or to guarantee that the variance would be granted. Nonetheless, this does not answer the question of whether Morton Buildings fulfilled its duty to inquire whether the variance had been granted prior to beginning construction.
The record herein reveals that on November 2, 1994, after Smyda had submitted the applications for the building permit and the variance, the City/Parish issued a budding permit for construction of the gymnasium. Smyda testified at trial that at the time the building permit was issued, he assumed, without making any further inquiry as to the status of the variance application, that the flood elevation variance had been granted as well. Thus, Morton Buildings began | ^construction of the gymnasium two to three days after issuance of the building permit.
In support of its contention that Smyda was justified in relying upon the issuance of the permit as confirmation that the variance had also been granted, Morton Buildings offered the testimony of John Webb, who was accepted as an expert in the field of architecture. Webb testified that, in his professional opinion, issuance of a building permit authorizes the contractor to begin construction and indicates that all questions relating to the permit have been successfully answered.
Nevertheless, we note that the authority of Morton Buildings to proceed with construction was governed by the building permit itself. The building permit contains a specific qualification, i.e., “the builder has certified all work will be done in accordance with the City-Parish Code of Ordinances, the State Fire Marshal’s Act, the Fire Prevention Ordinance and the State Sanitary Code.” (Emphasis added). There is no indication in the building permit that the builder had been exempted from any requirements of the building code, namely the flood elevation requirements. Nonetheless, upon receiving this building permit, Smyda did not make any inquiries of the City/Parish to determine whether the flood variance had been granted. Instead, he just assumed that it had been.
Because the building permit legally authorized Morton Buildings to perform work only in accordance with the building code and because Smyda, on behalf of Morton Buildings, made no effort to determine if the variance had in fact been granted prior to the commencement of construction, we must conclude that the trial court was clearly wrong in finding no breach of contract by Morton Buildings. In sum, between these two parties, Morton Buildings had the obligation to handle the variance application, which included the duty to follow through the process to determine whether the application had been granted prior to beginning construction. Morton Buildings clearly breached this duty by simply assuming |nthat the variance had been granted by virtue of the building permit being granted.[5] We, therefore, find that the trial court erred in concluding that Redeeming Word failed to prove a breach of the construction contract by Morton Buildings.
Additionally, because the construction contract included the elevation requirements of the building code in the absence of a variance, Velasquez, 246 So.2d at 700, the gymnasium was not constructed in accordance with the building contract. Thus, we likewise find manifest error in the trial court’s conclusion that the building was substantially complete. Because
*12 the building was not constructed in accordance with the City/Parish building code, Redeeming Word • cannot obtain a certificate of permanent occupancy for the building. A contractor is entitled to recover the contract price only if he has “substantially performed” the contract, meaning that the construction is fit for the purpose intended despite the deficiencies. Anderson v. Green, 454 So.2d 200, 202 (La.App. 1st Cir.), writ denied, 459 So.2d 539 (La.1984). Because the building cannot serve its intended purpose at its present elevation, Morton Buildings failed to prove its entitlement to payment on the construction contract.[6]
Regarding Redeeming Word’s entitlement to damages on its reconven-tional demand, where the construction is so defective that it would be useless, the loss sustained is the price paid for the construction of the thing, plus the removal thereof, and the cost of restoring the premises to its former condition. Crescent 119 Coating Company, Inc. v. Berghman, 480 So.2d 1013, 1019 (La.App. 5th Cir. 1985). While we conclude that Redeeming Word has proven its entitlement to return of the sums it paid on the construction contract, we find that it has failed to establish its entitlement to any further damages. In its reconventional demand, Redeeming Word prayed for the costs of razing the existing building, removing the debris, and replacing interior fixtures, works, constructions and decorations which cannot be removed without destruction or damage, as well as damages for inconvenience and aggravation. However, .Redeeming Word offered no evidence at trial to prove these damages. As such, Redeeming Word is only entitled to return of the price paid on the construction contract, an amount totaling $162,509.40.[7] Because Redeeming Word has not established any breach of the design services contract, Morton Builders is entitled to a credit of $2,000.00 against the sum owed Redeeming Word, representing the unpaid balance on the design services.
Because we have found merit to Redeeming Word’s first and second assignments of error, we pretermit discussion of assignments of error three and four.
DECREE
For the above and foregoing reasons, the September 23, 1996 judgment of the trial court is reversed in its entirety. Judgment is hereby rendered in favor of Redeeming Word and against Morton Builders in the amount of $160,509.40. Costs of this appeal are assessed against plaintiff, Morton Builders, Inc.
REVERSED AND RENDERED.
SHORTESS, C.J., concurs with reasons.

. The Building Code for the City/Parish provides that all applications for permits shall be accompanied by two sets of drawings, showing among other things elevations of the proposed structure. City of Baton Rouge/Parish of East Baton Rouge Code, §§ 8:103.2, 8:843.

. Apparently, the property in question had been included in a flood zone on a flood insurance rate map issued by the Federal Emergency Management Agency subsequent to the construction of the other building on the property, necessitating a higher elevation ■ for the gymnasium.

. Redeeming Word has been granted a temporary occupancy permit and temporary utility connections, allowing the church to occupy the building with certain limitations. According to Reverend Diamond, this temporary occupancy permit was granted for the duration of this litigation.

. Morton Buildings also named Reverend Diamond in his individual capacity as a defendant. However, at trial of the matter, Morton Buildings stipulated that Reverend Diamond had been acting in a representative capacity for the church and withdrew its claim against him personally.

. Smyda testified that he "understood” that if there were any problems with the permit and variance applications, he would be notified by letter before the building permit was granted. He further testified that he was told "by the Department” that if there was anything wrong with the application, the plans would not be approved. Nonetheless, we cannot conclude that this relieved Morton Buildings of the duty owed to Redeeming Word to make some affirmative effort to ascertain whether the variance had been granted prior to beginning construction.

. Although Redeeming Word has been granted a temporary occupancy permit with certain restrictions on use, as stated above, the record indicates that this permit was granted for the duration of this litigation. Unless Redeeming Word is able to bring the building into compliance with the code, which cannot be done at this elevation, no certificate of permanent occupancy will be granted, and the building cannot serve its intended purpose.

. In its reconventional demand, Redeeming Word contended that it had paid a total of $167,704.40. This $5,195.00 discrepancy apparently represents the price of the change order, which Reverend Diamond mistakenly believed he had paid.